**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HERMAN WILLIAMS, | |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| LUCIAN TESSMANN, individually and as an agent of the City of Waukegan, Illinois, and Lake County, Illinois; CHARLES FAGAN, individually and as an agent of Lake County, Illinois; KIMBERLY GAROFALO, as Independent Administrator of the ESTATE OF GREGORY GAROFALO, Deceased; DENNIS PENSALA, individually and as an agent of Lake County, Illinois; CHARLES BELL, individually and as an agent of the Village of Libertyville, Illinois, and Lake County, Illinois; RICHARD DAVIES, individually and as an agent of the Village of Vernon Hills, Illinois, and Lake County, Illinois; ROBERT RANDALL, individually and as an agent of Lake County, Illinois; LEONARD BREZINSKI, individually and as an agent of Lake County, Illinois; DANIEL COLIN, individually and as an agent of Lake County, Illinois; MICHAEL MERMEL, individually and as an agent Lake County, Illinois; KAREN JONES, as Independent Administrator of the ESTATE OF NANCY JONES, Deceased; LAKE COUNTY, ILLINOIS, a municipal corporation; CITY OF WAUKEGAN, ILLINOIS, a municipal corporation; MICHAEL WALLER, in his official capacity as former State's Attorney of Lake County, Illinois; VILLAGE OF GURNEE, ILLINOIS, a municipal corporation; VILLAGE OF LIBERTYVILLE, ILLINOIS, a municipal corporation; VILLAGE OF VERNON HILLS, ILLINOIS; a municipal corporation; COOK COUNTY, ILLINOIS, a municipal corporation, | |
| Defendants. | |

**COMPLAINT**

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION......................................................................................1

JURISDICTION AND VENUE ...................................................................................3

THE PARTIES ...........................................................................................................3

FACTS APPLICABLE TO ALL COUNTS...................................................................6

   I.     Penny Williams' body was discovered on Sunday, September 26, 1993. .................6

   II.    Penny and Herman enjoyed a platonic and strong relationship in the months leading to her death. ..................................................................................7

   III.   The State falsely theorized that Herman killed Penny on the evening of Wednesday, September 22, 1993. ...............................................................8

       A.    The evening of Wednesday, September 22, 1993. .............................9

       B.    Thursday, September 23, 1993. ....................................................10

       C.    Penny's disappearance. ...............................................................12

   IV.   The case is turned over to the Lake County Major Crime Task Force. .................13

       A.    The Task Force had tunnel vision as to Herman's guilt and coerced witnesses to fit their narrative. ..........................................................14

       B.    Sgt. Lou Tessmann fabricated a confession from Herman with Sgt. Fagan's knowledge. ....................................................................15

   V.    The Lake County State's Attorney's Office investigated and prosecuted Herman's case. ..................................................................................18

       A.    Assistant State's Attorney Michael Mermel fabricated evidence pertaining to where Penny's purse was found. ................................................18

       B.    Assistant State's Attorney Michael Mermel, along with medical examiner Nancy Jones, fabricated evidence pertaining to Penny's time of death. .........20

   VI.   Herman was tried and convicted based on false evidence and junk science. ........21

   VII.  After decades in prison, Herman finally proved his innocence through forensic re-examination and new testing as well as demonstration of serial misconduct by law enforcement. ..................................................................................24

   VIII. Herman's conviction was vacated with the support of the Lake County State's Attorney, who acknowledged serial misconduct as well as the falsity of the junk science used against Herman at trial.......................................................26

IX.    **Defendants ignored promising suspects and evidence in Penny's murder.** ...........30

X.    **Sgt. Tessmann repeatedly fabricated confessions and evidence in other cases in the same way he did here.** ........................................................................................32

XI.    **ASA Michael Mermel was forced to resign from the Lake County State's Attorney's Office in 2011 due to behavior unbecoming of a law enforcement officer.** ........................................................................................34

XII.    **Herman Williams suffered ceaselessly during his three-decades long imprisonment and continues to suffer today.** ...........................................35

**CLAIMS** ........................................................................................36

**PRAYER FOR RELIEF** ........................................................................................48

**JURY DEMAND** ........................................................................................49

Plaintiff Herman Williams, by and through his counsel, Romanucci & Blandin, LLC, and Hart McLaughlin & Eldridge, LLC, states as follows for his Complaint against Defendants Lucian "Lou" Tessmann, individually and as an agent of the City of Waukegan, Illinois, and Lake County, Illinois; Charles Fagan, individually and as an agent of Lake County, Illinois; Kimberly Garofalo, as Independent Administrator of the Estate of Gregory Garofalo, deceased; Dennis Pensala, individually and as an agent of Lake County, Illinois; Charles Bell, individually and as an agent of the Village of Libertyville, Illinois, and Lake County, Illinois; Richard Davies, individually and as an agent of Lake County, Illinois; Robert Randall, individually and as an agent of Lake County, Illinois; Leonard Brezinski, individually and as an agent of Lake County, Illinois; Daniel Colin, individually and as an agent of Lake County, Illinois; Michael Mermel, individually and as an agent of Lake County, Illinois; Karen Jones, as Independent Administrator of the Estate of Nancy Jones, deceased; Lake County, Illinois, a municipal corporation; City of Waukegan, Illinois, a municipal corporation; Michael Waller, in his official capacity as then-State's Attorney of Lake County, Illinois; Village of Gurnee, Illinois, a municipal corporation; Village of Libertyville, Illinois, a municipal corporation; Village of Vernon Hills, Illinois, a municipal corporation; and Cook County, Illinois, a municipal corporation:

## OVERVIEW OF THE ACTION

1.      In 1994, Herman Williams was wrongfully convicted of the murder of Penny Williams. Penny was Herman's former wife and the mother of Herman and Penny's two children.

2.      Herman spent nearly 30 years imprisoned before forensic testing and revelations of serial misconduct by police and prosecutors demonstrated his innocence. He never once wavered in his declaration of innocence throughout that time.

3.      Accordingly, on September 6, 2022, Herman's conviction was vacated with the full support of the Lake County State's Attorney's Office who had prosecuted him. Indeed, the State's Attorney proclaimed that it had "no good faith basis to oppose" Herman's request for vacatur.

1

4.      Of the several actors responsible for Herman's wrongful conviction, two now-notorious former agents of Lake County played a particularly significant role. Former Sgt. Lou Tessmann of the Lake County Major Crime Task Force and Waukegan Police Department falsely claimed and testified before a jury that Herman confessed to Penny's murder. Sgt. Tessmann's claim and his testimony were fiction.

5.      For Sgt. Tessmann, manufacturing confessions and perjuring himself in a court of law were his modus operandi. As the State's Attorney put it, in supporting vacatur of Herman's conviction, "since the time of Mr. Williams' trial, it has come to light that Detective Tessmann has engaged in a pattern of misconduct by giving false testimony under oath related to the circumstances of custodial interrogations and manufacturing confession evidence in other cases." In short, Sgt. Tessmann is a liar of the worst kind.

6.      In addition, former Assistant State's Attorney Michael Mermel, of the Lake County State's Attorney's Office, fabricated evidence during his investigation and withheld material evidence of Herman's innocence. ASA Mermel even went so far as to make arguments to the jury that he not only knew were false, but that contradicted evidence of Herman's innocence. Indeed, the Lake County State's Attorney has conceded these facts, namely, that, in this case, ASA Mermel withheld material evidence of Herman's innocence and presented "false evidence and misleading arguments to the jury." ASA Mermel is another inveterate liar.

7.      Sgt. Tessmann and ASA Mermel did not act alone, however. They were aided by the misconduct of other officers with the Lake County Major Crime Task Force and its constituent agencies.

8.      Their serial misconduct did not occur in a vacuum. It was emblematic of a pattern of evidence fabrication, witness coercion, and evidence concealment commonplace in the Lake County Major Crime Task Force, the Waukegan Police Department, and the Lake County State's Attorney's

Office in the late 1980s to mid-1990s. Therefore, Herman Williams brings claims against these entities as well pursuant to *Monell v. Dept. of Soc. Svcs. of the City of New York*, 436 U.S. 658 (1978).

9.      At bottom, Herman Williams seeks some measure of redress for a life stolen from him by Defendants. Below are his detailed allegations in support.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 in that claims in this action arise under the United States Constitution.

11.     To the extent that some of Plaintiff's claims arise under Illinois state law, the Court has supplemental subject matter jurisdiction over those claims under 28 U.S.C. § 1367(a).

12.     The Court has personal jurisdiction over Defendants because at least some reside in the State of Illinois and because their conduct described herein occurred exclusively in Illinois.

13.     Venue is proper in this Court because Plaintiff Herman Williams' injuries and damages occurred in the Northern District of Illinois, most Defendants reside and conduct business in the Northern District of Illinois, and virtually all the occurrences described herein occurred in the Northern District of Illinois.

## THE PARTIES

14.     Plaintiff Herman Williams was wrongfully convicted of the murder of Penny Williams on February 18, 1994, and served nearly 29 years in prison until his release on September 6, 2022. Herman currently resides in Arizona.

15.     Defendant Lucian "Lou" Tessmann was a sergeant formerly with the police department of the City of Waukegan, Illinois. He was the Deputy Commander of the Lake County Major Crime Task Force and assigned to investigate the murder of Penny Williams. He interrogated Herman Williams on September 30, 1993, and testified at trial against Herman Williams.

3

16.     Defendant Charles Fagan was a sergeant formerly with the Lake County Sheriff's Office. He was the Assistant Commander of the Lake County Major Crime Task Force and assigned to oversee the investigation of the murder of Penny Williams. He facilitated and/or participated in the interrogation of Herman Williams by Sgt. Tessmann on September 30, 1993, and testified at trial against Herman Williams.

17.     Defendant Kimberly Garofalo, as Independent Administrator of the Estate of Gregory Garofalo, deceased, is the legally appointed party administering the Estate of Gregory Garofalo. Garofalo was a sergeant formerly with the police department of the Village of Gurnee, Illinois. He questioned Herman Williams on September 24, 1993, and testified at trial against Herman Williams.

18.     Defendant Dennis Pensala was formerly an investigator with the Lake County State's Attorney's Office. He assisted Assistant State's Attorney Michael Mermel in manufacturing evidence as to the location Penny Williams' purse was found after her disappearance. Pensala also testified at trial against Herman Williams.

19.     Defendant Charles Bell was formerly a detective with the police department of the Village of Libertyville, Illinois. He was assigned to the Lake County Major Crime Task Force to assist in the investigation into Penny Williams' murder and questioned relevant witnesses. He further assisted Assistant State's Attorney Michael Mermel with manufacturing evidence as to the location Penny Williams' purse was found after her disappearance. Bell also testified at trial against Herman Williams.

20.     Defendant Richard Davies was formerly a police officer with the Village of Vernon Hills, Illinois. He was assigned to the Lake County Major Crime Task Force to assist in the investigation into Penny Williams' murder and questioned relevant witnesses.

21.     Defendant Robert Randall was formerly a deputy with the Lake County Sheriff's Office. He was assigned to the Lake County Major Crime Task Force to assist in the investigation into Penny Williams' murder and questioned relevant witnesses. Randall also testified at trial against Herman Williams.

22.     Defendant Leonard Brezinski was formerly a deputy with the Lake County Sheriff's Office. He was assigned to the Lake County Major Crime Task Force to assist in the investigation into Penny Williams' murder and questioned relevant witnesses.

23.     Defendant Daniel Colin was formerly a deputy with the Lake County Sheriff's Office. He was assigned to the Lake County Major Crime Task Force to assist in the investigation into Penny Williams' murder and questioned relevant witnesses.

24.     Defendant Michael Mermel is formerly an Assistant State's Attorney with the Lake County State's Attorney's Office. He investigated the murder of Penny Williams and was the lead prosecutor at the murder trial of Herman Williams. He was forced to resign from the Lake County State's Attorney's Office in 2011 in the wake of public comments he had made.

25.     Defendant Karen Jones, as Independent Administrator of the Estate of Nancy Jones, deceased, is the legally appointed party administering the estate of former medical examiner Nancy Jones, M.D... Dr. Jones performed an autopsy on Penny Williams, provided information to ASA Mermel as to Penny Williams' time of death, and testified against Herman Williams at trial. Dr. Jones was a medical examiner for Cook County, Illinois, performing services for Lake County, Illinois, with respect to Penny Williams.

26.     Defendant Lake County, Illinois, is a municipality and governmental entity with a county seat in Waukegan, Illinois, responsible for the Lake County State's Attorney's Office, Lake County Major Crime Task Force, and Lake County Sheriff's Office.

27.     Defendant City of Waukegan, Illinois, is a municipality and governmental entity, the county seat of Lake County, Illinois, and employer of Defendant Lou Tessmann at the relevant time.

28.     Defendant Michael Waller is the former State's Attorney of Lake County, Illinois, at the time Plaintiff was prosecuted and convicted. He is sued in his official capacity only for the policies, patterns, and practices of the Lake County State's Attorney's Office.

29.     Defendant Village of Gurnee, Illinois, is a municipality and governmental entity, which employed deceased Defendant Gregory Garofalo at the relevant time.

30.     Defendant Village of Libertyville, Illinois, is a municipality and governmental entity, which employed Defendant Charles Bell at the relevant time.

31.     Defendant Village of Vernon Hills, Illinois, is a municipality and governmental entity, which employed Defendant Richard Davies at the relevant time.

32.     Defendant Cook County, Illinois, is a municipality and governmental entity, which employed Dr. Nancy Jones at the relevant time.

### FACTS APPLICABLE TO ALL COUNTS

**I.     Penny Williams' body was discovered on Sunday, September 26, 1993.**

33.     On Sunday, September 26, 1993, the body of 27-year-old Penny Williams ("Penny") was found by police in a shallow pond near Midlane Country Club in Waukegan, Illinois. Penny was Plaintiff Herman Williams' former wife and the mother of their two young children.

34.     The pond where Penny's body was discovered was in an off-road area inaccessible to regular vehicles. People would take their 4x4 vehicles "four-wheeling" or "mudding" there. A neighbor of Penny's and Herman's, Wayne Ecklund, had led police to the area where Penny's body was found.

35.     An autopsy was performed by forensic pathologist, Defendant Nancy Jones, M.D., the same day. Dr. Jones quickly determined that Penny was the victim of a homicide. Penny had lethal

blunt force injuries to her head and abdomen as well as defensive wounds indicative of having fought her assailant. Dr. Jones determined that Penny was killed before being placed into the pond.

**II. Penny and Herman enjoyed a platonic and strong relationship in the months leading to her death.**

36. Penny and Herman's relationship would become central to police and prosecutors' false attacks on Herman.

37. At the time of Penny's death, Penny and Herman Williams were divorced. They had married in Arizona in 1986. They had two children together, Charlie and Crystal. Charlie was six and Crystal was three years old at the time of Penny's death.

38. Herman was a decorated member of the U.S. Navy. At 29, he was a leading Chief Petty Officer and his military experience spanned over a decade. He had Top Secret security clearance and had served two tours in the Gulf War.

39. While Penny and Herman were still married, Herman was transferred to Naval Station Great Lakes in Lake County, Illinois ("Great Lakes Naval Base"). Penny and Herman moved with the children to Illinois as a part of that transfer and lived together.

40. Seven years into the marriage, Herman and Penny divorced. Penny returned to Arizona with the children and lived with her parents.

41. Thereafter in 1992, Herman married Katherine "Kitty" Williams ("Kitty"), and Kitty and Herman lived together at 765 Depot Road in Gurnee, Illinois ("the Depot Road Apartments"). Herman and Kitty remained married at the time of Penny's death.

42. However, Herman missed his children. In 1993, Penny decided to move with the children back to Illinois. This prompted Herman's wife Kitty to move out of the Depot Road Apartments and into an apartment complex in nearby Park City, Illinois, called the Colonial Apartments.

43. Penny and the children moved in with Herman at the Depot Road Apartments after Kitty moved out. Nonetheless, she and Herman maintained only a platonic relationship. To that end, Herman purchased furniture, including a separate pull-out bed, so that Herman and Penny could maintain their separate sleeping arrangements. They had resolved to remain good friends and raise their children amicably.

44. In 1993, Herman received naval orders that he would be transferred to San Diego, California, by the end of the year, where he would board a vessel and go out to sea. He informed both Penny and Kitty. In anticipation of the move, Herman arranged with the Depot Road landlord for Penny and the kids to remain in the apartment through at least the end of the lease.

45. In short, Herman had neither a plan nor a motive to murder Penny. The days leading up to her death demonstrate that their relationship was strong.

### III. The State falsely theorized that Herman killed Penny on the evening of Wednesday, September 22, 1993.

46. The days leading to the discovery of Penny's body on Sunday, September 26, 1993, are crucial to understanding the case against Herman.

47. At Herman's trial, the State theorized that Herman murdered Penny on the evening of Wednesday, September 22, 1993 — likely between 8:00 – 9:00 p.m., but no later than 1:00 a.m. on the morning of Thursday, September 24. The reason for such a timeframe was that the record made it near impossible for Herman to have murdered Penny after Wednesday evening, particularly after 9:00 p.m., since his whereabouts thereafter were accounted for and extensively corroborated.

48. Contrary to the State's theory, however, Penny was alive and well on Wednesday night *and* Thursday morning, as she was seen by and interacted with multiple witnesses during that timeframe, including Herman, her neighbor Wayne Ecklund, and her children.

8

**A. The evening of Wednesday, September 22, 1993.**

49.     Specifically, on Wednesday, September 22, 1993, Herman and Penny decided to see a movie at Lakehurst Mall in Gurnee. Their downstairs neighbor at the Depot Road Apartments, Wayne Ecklund, had two young children around the same age as Charlie and Crystal Williams. Wayne and Herman would occasionally swap babysitting duties for their children. Accordingly, on Wednesday evening, Wayne agreed to babysit Charlie and Crystal when Herman and Penny went to the movies.

50.     About 7:45 p.m., Herman and Penny dropped the children at Wayne's apartment and left for the movies. Neighbors who saw Herman and Penny leave from the parking lot that evening said Penny was wearing a blue and white striped shirt.

51.     When Herman and Penny arrived at the theater, the movie they had planned to see had already begun. Since the next showing did not start until much later, they decided to skip the movie and shop at Lakehurst Mall instead.

52.     After browsing bedroom furniture for the children at a Montgomery Wards department store, Herman decided to take his pick-up truck to a car wash. Herman had purchased a new truck with his Navy reenlistment bonus and kept it very clean, as neighbors attested. Penny asked Herman to drop her at home beforehand, which he did. Herman then headed to a car wash that he frequented, where he used a power spray to clean his truck.

53.     From there, Herman decided to visit Kitty at her apartment. Kitty was taking a trip to Michigan's Upper Peninsula that weekend. Accordingly, before driving to Kitty's, Herman stopped at his storage locker to get a cooler to give to Kitty for her weekend trip. When he arrived, however, he realized he did not have the key to enter and so he left empty-handed.

54.     Herman then bought an iced tea at a nearby McDonald's restaurant. The receipt for his purchase was timestamped 9:03 p.m.

55. Herman then went to Kitty's apartment. When he arrived, Kitty was fidgeting with a camera Herman had recently given her, but the camera needed batteries. Herman and Kitty walked to K-Mart to buy some. Security footage showed Herman and Kitty there from 9:28 p.m. to 9:43 p.m.

56. At K-Mart Herman and Kitty bought batteries as well as some items for Herman's children, including hair clips for Crystal. Afterward, Herman dropped Kitty at home. Kitty, who worked in a T-shirt shop at Lakehurst Mall, gave Herman some t-shirts she had made for Charlie and Crystal. Herman then walked to his car and drove home to the Depot Road Apartments.

57. Upon arriving home, Penny was alone and writing a letter to a friend. She had not yet retrieved the children from Wayne's apartment. After talking for a bit, at about 10:30 p.m., Herman and Penny walked together downstairs to Wayne's apartment to pick up the children.

58. Wayne Ecklund confirmed this timeline to the Lake County Major Crime Task Force, who ultimately handled the murder investigation. On Saturday, September 25, 1993 (when Penny was still missing), Wayne's statement to police (Ofc. Robert Randall) was memorialized as follows:

> "Penny and [Herman] returned [from Lakehurst Mall] approximately two hours later, around 10:00PM to 10:30PM. Mr. Ecklund stated that [Herman] had a K-Mart bag with him and recalls that Crystal was given a pink sweatshirt out of this bag, because Mr. Ecklund was teasing her that it was his sweatshirt. According to Mr. Ecklund, Penny went immediately upstairs with Crystal[,] and [Herman] stood in the doorway of the patio with Charlie and talked for a few minutes. Mr. Ecklund advised that all four of the Williams would have had to have been in the apartment by 10:30PM."

**B. Thursday, September 23, 1993.**

59. On the following morning, Thursday, September 23, 1993, Herman and Penny helped the kids get ready for school and daycare. Herman dressed for work and, at about 6:45 a.m., Herman dropped Charlie at the Ecklunds' apartment as he regularly did, so that Charlie could meet up with the Ecklund children to go to school together. Herman then dropped Crystal off at the babysitter's house as he regularly did and headed to the Great Lakes Naval Base for work, where he typically

arrived about 7:00 a.m. The last time Herman saw Penny was when he left the Depot Road Apartments that morning of Thursday, September 23, 1993.

60.     Witness statements supported this. On Friday, September 24, 1993, six-year-old Charlie was interviewed by police (Ofc. Adkins and Ofc. Patrick), with Herman's consent, in the principal's office at Charlie's school. Charlie was in the First Grade. Charlie's statement to police was memorialized as follows:

> "[H]e had woke up and had breakfast and mom and dad were talking in the living room. He then said that he went to the bus stop to go to school. He said that his friends Cory [Ecklund] and Cody [Ecklund] were there. He said his dad then left for work before he had left for school . . . ."

61.     When police pressed six-year-old Charlie again as to what happened Thursday morning (i.e., the day before the interview), Charlie affirmed that his mother was home and provided extensive detail in support. As documented by police:

> "[Charlie] again stated that he had breakfast and that he had cereal for breakfast and that his mom had poured the milk for him. He stated that after he finished his breakfast, he put his bowl in the sink and that he went to his room to get his tote bag. He then put on his coat and went to the bus stop. He stated that his mom was in the house at the time and that she was in the living room sitting up and that he gave mom a hug and kiss before he left."

62.     After Herman had dropped Charlie off at Wayne's Thursday morning, Wayne subsequently sent Charlie and one of his sons upstairs to check with Penny to see if Wayne needed to pick up the kids from school. When the kids returned, they had not spoken to Penny but Wayne Ecklund recalled Charlie saying that he saw his mother get into a car with someone.

63.     Accordingly, both Wayne Ecklund's and Charlie Williams' initial statements to police, in the immediate aftermath of Penny's disappearance and death, demonstrate that Herman Williams did not and could not have killed Penny on Wednesday evening. Penny was alive both Wednesday evening and Thursday morning when Herman left the Depot Road Apartments.

**C. Penny's disappearance.**

64. About Noon, on Thursday, September 24, 1993, Herman returned home from the Naval base and Penny was not home. As time went on and Penny had not returned, Herman grew concerned because Penny was supposed to be taking the day off work and helping with the kids.

65. Wayne Ecklund told Herman what Charlie had said about seeing Penny get into a car with someone. Herman called the retail store where Penny worked (Syms) to see if she had gone there, but she had not.

66. By Thursday evening, when Penny still had not returned, Herman called the Gurnee Police Department to ask if he could report a missing person. He was told to wait until the following day as insufficient time had passed since Penny went missing.

67. The following day, on the morning of Friday, September 24, 1993, Penny Williams' purse was brought to the Great Lakes Naval Base. The official report indicated that the purse had been found in the trash at Park City Car Wash, 3253 Belvidere Road, Park City, Illinois. The purse was found there by an intellectually challenged man named Leo Arispe, who typically searched through the trash looking for aluminum cans.

68. Indeed, when interviewed by police (Ofc. William Valko), the owner of Park City Car Wash (Charles Spencer) told police to "check" with Mr. Arispe as to the finding of the purse, describing Mr. Arispe as "a Spanish man across the alley, who goes through the dumpster." Mr. Arispe was indeed a native Spanish speaker who did not speak English; he lived across the alley from the car wash and frequented the dumpster there.

69. On that same Friday morning, September 24, immediately upon arriving on base, Herman used the telephone to call the Gurnee Police Department to follow up and file a missing person report. While on that phone call, he was given a message that he needed to call the Great Lakes Police Department. He then called the Great Lakes Police Department and was told they had Penny's

purse. Upon learning that information, he got back on the line with the Gurnee Police Department. He told Gurnee PD what he had just been informed and told them he would bring them the purse, which he did. Police began their investigation into Penny's disappearance.

70.     Sgt. Gregory Garofalo of the Gurnee Police Department interviewed Herman first. Herman was forthright, answered the officer's questions, and maintained his innocence. However, when Sgt. Garofalo learned that Herman was living with Penny but still married to Kitty, he found this to be a suspicious and significant piece of evidence.

71.     In support of establishing a motive for Herman to have killed Penny, Sgt. Garofalo falsely attributed numerous statements to Herman which Herman had not made, including that he had divorced Penny because she had gotten "fat and lazy," had lied to Penny about wanting to rekindle their relationship in order to have her return from Arizona, and desired to create a "Camelot Castle" wherein Penny, Kitty, he and the children would all live together.

72.     Further, at the direction of Lake County Assistant State's Attorney Michael Mermel, Sgt. Garofalo supplemented his report to include inaccurate details regarding Herman's response to Sgt. Garofalo's suggestion that he had killed Penny to obtain custody of his children. ASA Mermel expressly stated that he had Sgt. Garofalo prepare "a supplementary [report], the one I had him prepare, because his original report did not have this."

### IV.     The case is turned over to the Lake County Major Crime Task Force.

73.     On Saturday, September 25, 1993, the Gurnee Police Department turned the missing person case over to the Lake County Major Crime Task Force (the "Task Force").

74.     The Task Force was an inter-agency team of law enforcement officers from various local law enforcement agencies, who coordinated the investigation of certain serious cases. It had recently been formed in 1992.

75.     In 1993, the Task Force was run by Commander Gary Delre. Defendant Charles Fagan, who was then-Sergeant with the Lake County Sheriff's Office, was the Task Force's Assistant Commander. Defendant Lou Tessmann, then-Sergeant with the Waukegan Police Department, was a Deputy Commander. Sgt. Fagan and Sgt. Tessmann had a close relationship.

### A. The Task Force had tunnel vision as to Herman's guilt and coerced witnesses to fit their narrative.

76.     From the outset, the Task Force focused singularly on Herman Williams as the culprit in Penny's disappearance. Investigators coerced witnesses to change key aspects of their original statements to support their theory of Herman's guilt.

77.     On Saturday, September 25, 1993, Investigators Leonard Brezinski and Daniel Colin re-interviewed six-year-old Charlie Williams, who having just been removed from his home and thrust into an unknown situation, was at a residence at which he had just been placed by the Department of Children and Family Services. Police had initiated that placement due to the investigation of Herman for Penny's disappearance. On information and belief, the purpose of Inv. Brezinski's and Inv. Colin's interrogation was simply to cast doubt on Charlie as a witness generally, given that Charlie had provided alibi evidence for Herman the day before. In their report, officers now claimed that: "Charlie had no conception of days and when questioned about specific dates and times he was unable to accurately give any incidents. Charlie was asked if he had ever seen his mother get into another vehicle with someone else driving, at which time he stated no."

78.     Further, on Monday, September 27, 1993, the day after Wayne Ecklund led investigators to an area at Midlane where Penny's body was found, Investigators Robert Randall and Charles Bell re-interviewed Wayne Ecklund after Mr. Ecklund had been administered a polygraph exam by Reid & Associates.

79.     Officers suspected (or at least should have) that Wayne Ecklund might be involved in the murder given his initial statement to police (prior to leading them to the place where Penny was

found). Specifically, in that initial statement, Wayne told police that he went "off-roading" near the Midlane pond on Thursday evening and he talked about having been off-roading in that area previously. As mentioned above, he led officers to that area for the purpose of searching for Penny's body, which officers found there on September 26, 1993.

80.     However, rather than investigate Mr. Ecklund further, officers coerced him into changing his story to fit the narrative that Herman had murdered Penny. Specifically, Officers Randall and Bell told Mr. Ecklund that he had been deceptive in his polygraph and coerced him to now say that he could no longer be certain that he saw Penny Williams return with Herman on Wednesday evening, September 22.

81.     In addition, on September 27, 1993, Investigators Charles Bell and Richard Davies sought to find the man, Jamie Correa, who turned Penny's purse in and told them it was found at the Park City Car Wash. Investigators interviewed Mr. Correa's girlfriend, Rosa Homann, who was Leo Arispe's sister.

82.     According to Ms. Homann, Mr. Arispe had given Homann's sister, Olga Wengel, the purse after finding it. Without explanation, the Bell/Davies police report indicates that the purse was not found at the car wash, but rather "in a dumpster at the Colonial Apartments." The report goes on to note that such dumpster "is within 200 [feet] of the apartment building where [Kitty] Williams is living[.]" On information and belief, Investigators Bell and Davies coerced the identification of the Colonial Apartments as the location where the purse was found to better fit the narrative of Herman's involvement in the murder.

**B. Sgt. Lou Tessmann fabricated a confession from Herman with Sgt. Fagan's knowledge.**

83.     On September 30, 1993, at about 4:00 p.m., Sgt. Lou Tessmann entered an interview room of the Criminal Investigation Division of the Lake County Sheriff's Department. Defendant Sgt. Fagan was in the room with Herman Williams. Sgt. Fagan left the room before or shortly after

Sgt. Tessmann begun any discussion with Herman. However, on information and belief, Sgt. Fagan watched the two speak from the other side of a two-way mirror.

84.     Sgt. Tessmann then questioned Herman. Herman maintained his innocence and repeatedly asked for a lawyer.

85.     Sgt. Tessmann did not take notes of the interrogation. He did not record it by video, audio, or in any other fashion.

86.     Sgt. Tessmann did not initially prepare a report documenting his purported interrogation of Herman.

87.     Afterward, public statements from relevant law enforcement personnel confirmed that Herman did not provide any information to Sgt. Tessmann or the Task Force. Specifically, the following day, on October 1, 1993, then Lake County State's Attorney Michael Waller publicly stated that Herman did not speak to the police or give a statement after his arrest. This was reported in an October 1, 1993, *Chicago Tribune* article, entitled "Sailor Held In Ex-Wife's Slaying," by Robert Enstad and Andrew Martin.

88.     Furthermore, a coroner's inquest occurred on November 10, 1993. Both Sgt. Fagan and Sgt. Tessmann were present. When questioned by a juror at the coroner's inquest, Defendant Sgt. Fagan testified under oath that the Task Force "never had an opportunity to interview Mr. Williams" and that the only time Herman was questioned was on Friday, September 25, 1993, by the Gurnee Police Department (Sgt. Garofalo) where Herman "denied any involvement in [Penny's] disappearance, and subsequent to their interview, he retained an attorney, and we had no further conversation with Mr. Williams in regard to the disappearance of his ex-wife."

89.     However, on October 12, 1993, nearly two weeks after Sgt. Tessmann's questioning of Herman and a month before the coroner's inquest, Sgt. Tessmann typed a three-page report wherein he claimed that Herman confessed to the murder in a variety of ways, including as follows:

a. After Sgt. Tessmann purportedly informed Herman "that a tremendous amount of information had been gathered throughout this investigation, and that it was [Tessmann]'s belief that [Herman] was responsible for causing the death of Penny . . . [Herman's] eyes [filled] up with tears and his head drop[ped] slightly."

b. When Tessmann then purportedly advised Herman, "I think things got out of hand that night. Am I right?" Herman allegedly "shook his head up and down with a yes gesture."

c. When in turn Tessmann allegedly stated to Herman, "you didn't mean to kill Penny, did you?" "Herman shook his head side to side with a no gesture."

d. Finally, when Sgt. Tessmann purportedly stated, "I know you're sorry for what happened, aren't you Herman?" Herman "then looked up at [Tessmann] and stated, 'I know what I did was wrong and I'm sorry for what happened.'"

90.     Sgt. Tessmann's report — most importantly his statements regarding Herman's inculpatory nods or shakes of the heads, statements of apology, and admissions of guilt — was an intentional and malicious fabrication. Herman never did or said any of those things and never, in any fashion, admitted that he was responsible for or had knowledge of the circumstances of Penny's murder.

91.     This was part of a pattern from Sgt. Tessmann, as the Lake County State's Attorney's Office would stipulate 29 years later at the hearing on Herman's petition to vacate. Herman's was not the only confession Sgt. Tessmann would fabricate during his years as a law enforcement officer. The kind of inculpatory gestures and statements Tessmann falsely attributed to Herman were hallmarks of similar false confessions he had attributed to other innocent suspects in other cases (discussed further below).

92.     Sgt. Fagan knew that Sgt. Tessmann's report was false based on one or more of the following: Sgt. Fagan watched Sgt. Tessmann's interrogation of Herman through a two-way mirror; Sgt. Fagan interviewed Herman about the case; the fact that there was no mention from Sgt. Tessmann of Herman's alleged confession before his October 12, 1993, report—such an omission would be unthinkable as part of a difficult murder investigation without direct evidence of a culprit; and/or Sgt. Fagan testified under oath that there was no such confession at the November 10, 1993, coroner's inquest.

## V.     The Lake County State's Attorney's Office investigated and prosecuted Herman's case.

### A.     Assistant State's Attorney Michael Mermel fabricated evidence pertaining to where Penny's purse was found.

93.     The Lake County State's Attorney's Office prosecuted Herman for Penny's murder.

94.     The lead prosecutor on the case was Assistant State's Attorney Michael Mermel ("ASA Mermel").

95.     ASA Mermel involved himself in the investigation and fabricated evidence against Herman.

96.     Specifically, ASA Mermel fabricated evidence as to where Penny's purse had been found. After the purse found by Leo Arispe had been brought to the Naval base on Friday, September 24, 1993, the official report noted that it was found "in a car wash somewhere in Park City, Illinois." On October 14, 1993, the native Spanish-speaking Mr. Arispe was interviewed by police (Ofc. Robert Randall) without an interpreter. The police report indicated: "Mr. Arispe advised that he could not add anything further of personal knowledge or observations that would be beneficial, other than confirming the fact that was previously supplied in regards to the finding of the victim's purse in the trash can, which has previously been documented in reports by other investigators."

97.     However, police and ASA Mermel decided that the location of where the purse was found could be a persuasive piece of circumstantial evidence in the case against Herman. Accordingly, ASA Mermel involved himself in the investigation to bolster the story created during the September 27 interview of Rosa Homann that the purse had been found at the Colonial Apartments.

98.     On February 7, 1994, ASA Mermel, another ASA, and two law enforcement officers with the Task Force—Lake County State's Attorney's Office Investigator Dennis Pensala and Libertyville Police Detective Charles Bell—coerced the intellectually challenged Leo Arispe to partake in a staged, videotaped "reenactment" of his finding the purse in a Colonial Apartments dumpster. At ASA Mermel's direction, Detective Bell drove Mr. Arispe to the Colonial Apartments and Investigator Pensala held a camcorder to film Arispe taking a purse out of a dumpster near Kitty's apartment.

99.     The video of Arispe's purported "reenactment" was edited by ASA Mermel and had no sound. ASA Mermel, Detective Bell, and Investigator Pensala never disclosed the unedited, full version of the video in violation of their *Brady* obligations. In short, this purported reenactment was fabricated evidence instigated by ASA Mermel and fellow investigators. Mr. Arispe's trial testimony would indicate that they had shown him where the dumpster was. A still shot from the crude, edited video is shown here:



**B. Assistant State's Attorney Michael Mermel, along with medical examiner Nancy Jones, fabricated evidence pertaining to Penny's time of death.**

100.     Separately during the investigation, ASA Mermel spoke with Dr. Nancy Jones, the forensic pathologist who had performed Penny's autopsy, about time of death. Dr. Jones told ASA Mermel that she believed that Penny died anytime between the evening of Wednesday, September 22, 1993, until late Thursday, September 23 or even possibly early Friday morning, September 24, between 1:00 – 3:00 a.m. Testimony provided by Deputy Chief Coroner James Whipper at the November 10, 1993, coroner's inquest, supported this later timeline.

101.     On December 3, 1993, ASA Mermel authored an internal memorandum to ASA Goodstein, confirming the above: "According to Dr. Jones, Penny Williams could have died anytime between Wed 22, evening until late Thursday, 23rd. (Friday unlikely unless very early 1-3am)." A copy of that memorandum is shown here:



102.     Despite the centrality of time of death to Herman's case, this memorandum was not disclosed to Herman until nearly 30 years later, in 2021, as a part of the post-conviction process.

103.     ASA Mermel's concealment of this memorandum permitted he and Dr. Jones to arrive at a different time of death and to present it to the jury unfettered.

**VI.    Herman was tried and convicted based on false evidence and junk science.**

104.    The State's Attorney tried Herman for murder from February 14 – 18, 1994.

105.    The State presented its theory that Penny was killed by Herman sometime between 8:00 – 9:00 p.m. on Wednesday, September 22, 1993 — roughly sometime shortly after they left the Depot Road Apartments together and before Herman's 9:03 p.m. timestamped-trip to McDonald's.

106.    The State secured this theory with the testimony of Dr. Jones. After ASA Mermel's and Dr. Jones's discussion in 1993 (as documented in Mermel's undisclosed December 3, 1993, memorandum), ASA Mermel and Dr. Jones falsely concocted the story that time of death was most likely Wednesday evening, between 8:00 – 9:00 p.m.

107.    There was no scientifically supportable basis for Dr. Jones' drastically revised opinion. Dr. Jones and ASA Mermel concocted this false theory intentionally and maliciously, as demonstrated in numerous ways including that the theory was scientifically unsupportable, ASA Mermel intentionally withheld and concealed the December 3rd memorandum, and Dr. Jones falsely testified at trial that she had not previously held the opinion that the death could have occurred later on Thursday or into Friday morning.

108.    ASA Mermel and Dr. Jones sprung this new opinion on Herman for the first time at trial and relied heavily on such testimony through closing argument. All the while, both Mermel and Dr. Jones concealed the fact that Dr. Jones had arrived at a different conclusion months earlier.

109.    The State used other forensic evidence to link Herman to the murder. In particular, the State presented testimony from forensic analysts that tiny amounts of blood from Herman's truck interior and shoe were consistent with Penny's blood type. The State also presented expert testimony that soil from Herman's truck's wheel well was consistent with soil from the area where Penny's body was found. These conclusions were wrong. Worse, they were scientifically unsupportable. This would later be shown in post-conviction proceedings leading to Herman's release, as discussed further below.

21

110. Sgt. Tessmann testified at trial to Herman's "confession." In addition to the inculpatory head nods and statements described above, Sgt. Tessmann provided additional, false details regarding his interrogation of Herman. Such details were meant to suggest that the interrogation was a casual, conversational one. For example, Sgt. Tessmann falsely testified that he had provided Herman *Miranda* warnings, that the two had a relaxed conversation wherein Herman was sitting calmly, hands-free with a cup of coffee. Such details were intended to lend credence to Tessmann's story that Herman had spontaneously confessed to him, despite having maintained his innocence to all other investigators who had spoken to him prior. The truth was that Herman was forced into a chair in an interrogation room with a two-way mirror, with his hands cuffed behind his back, and never provided anything to drink during the time Tessmann interrogated him.

111. Still further, ASA Mermel, through Defendant Investigator Dennis Pensala, Defendant Detective Charles Bell, and the edited videotape of Leo Arispe's purported reenactment, presented evidence that Penny's purse was found in the dumpster near Kitty Williams' apartment. ASA Mermel, Investigator Pensala, and Detective Bell all indicated that Leo Arispe had taken the officers and ASA Mermel there without any suggestion or coercion. They even claimed they were unaware of the location of the dumpster, despite the fact that Detective Bell was involved in coercing Rosa Homann's purported September 27 identification of the Colonial Apartments dumpster. Based on the testimony regarding Mr. Arispe, ASA Mermel argued that Herman disposed of the purse near Kitty's apartment on the evening of Wednesday, September 22, when he visited Kitty. As the State argued it to the jury, "Of all the dumpsters in all the world, this purse winds up 200 feet from [Kitty's] apartment. What are the chances?"

112. ASA Mermel as well as Investigator Pensala and Detective Bell knew that this narrative was false and that one or more of them was the genesis of Mr. Arispe's reenactment at that location. Indeed, Mr. Arispe's own testimony indicated that ASA Mermel and officers had shown him where

the Colonial Apartment dumpster was located for the film's reenactment. Moreover, Leo Arispe's incapacity—his susceptibility to coercion—is evident in the trial record. He was able to provide little information about himself, answered questions nonsensically, and could not handle the simplest of questions. This would explain why his sister, Ms. Homann, crudely characterized him as "retarded and [having] the mind of a child."

113. ASA Mermel also intentionally misrepresented material evidence to the judge and jury relating to the clothing Penny Williams was wearing when murdered. Penny Williams was found wearing a floral button-up shirt when she was found deceased. However, numerous witnesses had confirmed that she was wearing a different shirt — a blue-and-white striped button-down — on Wednesday evening when she left the Depot Road Apartments with Herman.

114. For example, on September 27, 1993, neighbor David Barker told police (Ofc. Hansen) that when he saw Penny on Wednesday evening, she was wearing "a light colored, possibly striped shirt." On October 1, 1993, neighbor Veronica Jones told police (Ofc. Valdez) that Penny was wearing a "white long sleeve shirt with blue lines and the sleeves rolled up" before she left the Depot Road Apartments with Herman. Such statements were evidence that Penny was not murdered on Wednesday night given that she was found deceased in a different shirt.

115. About this discrepancy, the State argued to the jury that Penny could have been wearing two shirts — one under the other — on the evening in question. However, ASA Mermel knew that was a false argument. A search of Penny and Herman's Depot Road Apartment on September 27, 1993, shortly after Penny had been found dead, had already recovered the blue and

23

white striped shirt she had been wearing on Wednesday. As shown in the photograph here, the shirt

remained in the State's possession while ASA Mermel lied to the jury about it:



116.    As such, ASA Mermel knowingly made false arguments to the jury in this respect as

well.

117.    Wayne Ecklund also testified at trial. Consistent with the coerced revised statement he

had given to officers, he testified that he did not see Penny return with Herman on Wednesday

evening.

118.    On February 18, 1994, on the strength of the above-described evidence fabrication,

witness coercion, and *Brady* and *Napue* violations, the jury convicted Herman of first-degree murder.

He was sentenced to life in prison.

**VII.    After decades in prison, Herman finally proved his innocence through forensic re-examination and new testing as well as demonstration of serial misconduct by law enforcement.**

119.    The years that followed were ones of incarceration, isolation, and psychological

torment as Herman unsuccessfully pursued appeals and post-conviction relief. All the while, his

children, Charlie and Crystal, believed Herman had murdered their mother.

120.    However, eventually Herman obtained representation from the Illinois Innocence

Project to handle post-conviction proceedings. Herman and his new attorneys fought for forensic

testing, which they were granted. As discussed below, such testing conclusively established Herman's innocence and debunked the junk science used against him at trial.

121. <u>DNA Underneath Penny's Fingernails</u>: DNA testing available only recently due to scientific advances (and unavailable to Herman in 1993) identified male DNA in the biological material collected from underneath Penny's fingernails at her autopsy. As discussed above, Penny was involved in a close-range confrontation with the person(s) who beat her, and she had defensive wounds indicating that she had fought to defend herself. DNA material underneath fingernails is rare and is not the product of casual scratching or other similar contact. Accordingly, the presence of such material here most likely represents the DNA of Penny's attacker(s). Testing of this new biological material conclusively *eliminated* Herman as the source of the male DNA captured from under Penny's fingernails.

122. <u>DNA Testing of Blood</u>: Post-conviction DNA testing also established that the miniscule blood evidence from Herman's truck, which the State argued to the jury was consistent with Penny's blood as well as Herman's involvement in the crime, does *not* belong to Penny. This conclusively established that the State's argument had no foundation.

123. <u>Evaluation of Dr. Jones' Time-of-Death Opinion</u>: Post-conviction review of Dr. Jones' time-of-death opinion established that Dr. Jones' opinion was scientifically unsupported. Two experts who conducted post-conviction review of Penny's death and autopsy determined that the more likely timeframe of Penny's death is closer to when her body was found on the afternoon of Sunday, September 26, 1993 — nowhere near Wednesday evening as Dr. Jones testified. Both experts concluded that there was no scientific basis to support Dr. Jones' trial opinion. Therefore, Penny died at a time Herman could not have been with her.

124. <u>Evaluation of Soil Comparison</u>: Post-conviction review of the soil comparison evidence from Herman's trial establishes that the trial testimony purportedly linking soil from the

crime scene to Herman's truck's wheel well — what prosecutors charitably and inaccurately called "soil matching" — is scientifically unsupported.

## VIII. Herman's conviction was vacated with the support of the Lake County State's Attorney, who acknowledged serial misconduct as well as the falsity of the junk science used against Herman at trial.

125. On July 1, 2022, on the strength of the forensic evidence above as well as revelations of investigative and other misconduct, Herman filed a petition to vacate his conviction pursuant to 735 ILCS 5/2-1401.

126. In response, the Lake County State's Attorney stated that it had "no good-faith basis to oppose" Herman's motion.

127. Moreover, the State's Attorney stipulated and agreed to numerous facts which confirm that police and prosecutors engaged in the serial misconduct described above and that the purported forensic evidence used against Herman at trial was false.

128. Such facts were set forth between Herman and the State's Attorney in seven stipulations. The transcript from the September 6, 2022, vacatur hearing setting forth those stipulations in detail is incorporated and attached as **Exhibit 1** here. Such stipulations are summarized as follows:

129. **Stipulation No. 1**: Herman's conviction was based on "evidence which included serological blood testing, time-of-death pathology, an alleged confession, and testimony regarding the location of where Penny's purse was found." Newly discovered evidence would, if presented to a jury, be likely to result in a verdict of not guilty. Herman's "constitutional rights were violated when exculpatory evidence was suppressed and by the State's use of false and misleading evidence at trial." As a result, Herman's conviction should be vacated.

130. **Stipulation No. 2**: DNA testing conducted during the post-conviction process establishes that Herman is excluded as the source of DNA material under Penny's nails and that the

trace blood evidence taken from Herman's truck does not belong to Penny. Further, DNA testing from material collected from the exterior of a checkbook taken from inside Penny's purse "identified a partial Y-DNA profile." When "compared to Herman's DNA profile, he is excluded as the source of that male DNA."

131.    **Stipulation No. 3:**    Time of death was an important issue at trial. Herman's "whereabouts were essentially accounted for from the morning of Thursday, September 23rd, until Ms. Williams' body was recovered on Sunday, September 26." Two forensic pathologists reviewed the autopsy evidence in this case and the testimony of Dr. Jones, namely, Dr. James Filkins and the State's pathologist, Dr. Eimad Zakariya. Both found that Dr. Jones' time-of-death opinion was scientifically unsupported and that the more likely timeframe for death was Saturday, September 25, 1993, or Sunday, September 26.

132.    **Stipulation No. 4:**    The State suppressed material exculpatory evidence in the form of Dr. Jones' pre-trial time-of-death opinion, which stretched into Friday, September 24, 1993. In conjunction, the State argued to the jury that Dr. Jones "didn't waver from her estimate of time" and Dr. Jones was able to imply the same in her testimony.

133.    **Stipulation No. 5 (quoted below in entirety from the transcript):**

"Stipulation 5 relating to the confession, it is hereby stipulated by and between the parties:

At Mr. Williams' trial, the State presented testimony from then-Detective Lou Tessmann, deputy commander of the Lake County Major Crimes Task Force and a lead investigator on this case. Detective Tessmann testified that on September 30th, 1993, during a custodial interrogation, Mr. Williams confessed to him to murdering Penny Williams by crying; nodding his head affirmatively to specific questions about the murder; and stating, quote, I know what I did was wrong, and I am sorry for what happened, end quote. At trial, Tessmann testified he remembered the specific words of his questions and Mr. Williams' answers despite having not taken any contemporaneous notes and having

no audio or video recording of the interrogation. Detective Tessmann's report detailing the alleged confession was not typed up until almost two weeks after the purported interview.

Herman Williams testified at trial that he never confessed to Detective Tessmann, neither through words nor head nods. To the contrary, Mr. Williams testified that he invoked his right to counsel and would not speak to Detective Tessmann.

The parties would stipulate that at a pretrial proceeding, the coroner's inquest, the commander of the Lake County Major Crimes Task Force, Chuck Fagan, testified under oath that, quote, the members of the Lake County Major Crimes Task Force never had an opportunity to interview Mr. Williams; originally, when he reported this disappearance to the Gurnee Police Department, for some period of time, in parentheticals, on Friday, September 24th, they questioned him, and he denied any involvement in her disappearance, and subsequent to their interview, he retained an attorney, and we had no further conversation with Mr. Williams in regards to the disappearance of his ex-wife, end quote.

The parties would further stipulate that then-State's Attorney Michael Waller publicly stated that Mr. Williams did not speak to the police or give a statement after his arrest. In a *Chicago Tribune* article from October 1st, 1993, the day after Tessmann's purported interrogation, State's Attorney Waller stated that, quote, the suspect made no statement to authorities about his former wife's death after his arrest, end quote.

The parties agree and would stipulate that since the time of Mr. Williams' trial, it has come to light that Detective Tessmann has engaged in a pattern of misconduct by giving false testimony under oath related to the circumstances of custodial interrogations and manufacturing confession evidence in other cases.

These cases include the case of Jason Strong, who was similarly convicted and later exonerated based on erroneous time-of-death testimony and a purported confession by Detective Tessmann.

28

In addition, in the case of Juan Rivera, who was ultimately exonerated, Detective Tessmann testified in a similar fashion to what we now know was a false confession.

At the time of trial, when the jury weighed the credibility of Mr. Williams' denials against Detective Tessmann's testimony that Mr. Williams had confessed, it did so unaware of the pattern and practice of misconduct in which Tessmann has engaged. This history includes involvement in securing false confessions and false testimony about the circumstances of custodial interrogations that he conducted and purported admissions he claimed were made by suspects who turned out to be innocent.

The parties agree there exists substantial, newly discovered evidence of police misconduct that resulted in Mr. Williams' unconstitutional conviction."

134. **Stipulation No. 6:** "The State presented false evidence and misleading arguments to the jury" when it argued that Penny may have been wearing two button-down shirts at the time of her murder — the floral button-down and the blue and white striped button-down — given that the State had recovered the striped shirt at Penny and Herman's Depot Road Apartment.

135. **Stipulation No. 7:** The State presented evidence at trial that neither prosecutors nor police officers knew the location of the dumpster near Kitty's apartment, suggested that Leo Arispe led them there on his own, and suggested that no one had previously provided conflicting information as to where the purse was found. Such evidence was contradicted by other evidence in the record.

136. As a result of the above, Herman's motion to vacate his conviction was granted on September 6, 2022, and the State declined to prosecute him again given the evidence demonstrating his innocence. Herman was finally released from prison on September 6, 2022, after spending nearly 29 years incarcerated.

**IX. Defendants ignored promising suspects and evidence in Penny's murder.**

137.    Herman is innocent of Penny's murder. He has never wavered in his declaration of innocence since he was first questioned regarding Penny's disappearance on September 25, 1993.

138.    Nonetheless, police and prosecutors' insistence on targeting Herman — and Herman alone — for Penny's murder caused them to ignore several suspects. Law enforcement repeatedly failed to perform even the simplest follow-up investigation after obtaining information that was relevant to Penny's disappearance and death.

139.    Set forth below are several persons whom police should have investigated further, but failed to, in their insistence to frame Herman:

a.    <u>Tim Marsden</u>: Tim Marsden was Penny's ex-live-in boyfriend in Arizona after her and Herman's divorce. It had been less than three months after Penny left Arizona and Tim when she was murdered. Herman informed police that he believed Tim visited Penny in Illinois just weeks prior to her murder. However, police only questioned Tim over the phone once and they took his word that "Penny had told him that she was taking her children to see her grandmother in Iowa, and that is the last time he talked to her."

b.    <u>Chris Jones</u>: One of Penny's co-workers at Syms was a man named Chris Jones. Earlier in the week, Penny had been out and had a few drinks with Chris at a Chili's. When police spoke with him, he said that he and Penny were supposed to meet on Thursday, September 23, pick up their paychecks and then go to lunch. Mr. Jones then spontaneously mentioned to police "that he had dated a girl one time that was found murdered" (in 1991 in Antioch, Illinois). "[H]e had dated this girl a couple of times and then she was missing and found a few days later murdered . . . Jones stated that this case reminded him of that incident and it was kind of spooky." Police did no further investigation. Had they, they would have

learned that Jones' ex-girlfriend was killed under eerily similar circumstances. She was missing prior to being found dead in a body of water and her purse had been discarded in a trash can.

c.     Wayne Ecklund: Police also did not follow up with Gerald Altman, a Marine who lived near the Midlane pond and who told detectives that on Thursday night at around 1:30 a.m., he heard the sound of someone banging on glass and a gunshot. This occurred at the same time Wayne Ecklund was at Midlane with a friend, Brian Lenkowski. Mr. Lenkowski told police that during their trip to Midlane, he got stuck and Wayne had to tow him out of the mud. Wayne Ecklund led police to the area where Penny's body was found. Police did not investigate Mr. Ecklund beyond coercing him to change his story with respect to Penny's whereabouts.

d.     Murder of Iris Stevens: Police also never followed up on a similar murder which occurred nearby, under similar circumstances, to determine whether hers and Penny's were related. On the very same day Penny's body was discovered officers were actually on their way to recover the body of another dead woman (Iris Stevens). The woman was found dead in a field by the Great Lakes Navy Base. She had been beaten in the chest and face, had a broken rib and broken facial and neck bones, and had been strangled and dragged through grass and mud and abandoned in the field.

e.     Suspicious Vehicle at Midlane: Officers talked to two men who had been at the Midlane pond on Thursday afternoon into the evening. They told officers that they had seen an unknown white male driving a white Chevy S10 pickup truck there. The officers did not follow up on this lead stating "[a]s the subject does not match the description of anyone involved in this case, this information seems to be of no help to this investigation."

140.    Penny's murder remains unsolved. This is another tragedy resulting from the misconduct in this case.

X.     **Sgt. Tessmann repeatedly fabricated confessions and evidence in other cases in the same way he did here.**

141.    As stipulated by the State's Attorney at Herman's vacatur hearing, Sgt. Tessmann participated in a "pattern and practice" of misconduct that mirrors the misconduct here.

142.    Such a pattern involves Sgt. Tessmann's fabricating confession evidence from innocent suspects and falsely testifying regarding both such confessions and the circumstances under which such purported confessions were obtained.

143.    To date, Sgt. Tessmann's behavior has resulted in at least three exonerations in addition to Herman's:

   a.  ***People v. Jason Strong.*** Jason Strong was convicted based on Sgt. Tessmann's account that Jason Strong and his co-defendant confessed to a 1999 murder, along with testimony from a pathologist that time of death was during a short window coinciding with Strong's confession. A post-conviction review of the pathology established that the time of death testimony was not scientifically sound and it was much more likely that the victim in that case had died a number of days earlier; the new expert reports demonstrated that the "confessions" by Jason Strong and his two co-defendants were demonstrably false. Based on "new pathologists' reports [that] undermined crucial elements of authorities' account of the murder, including when [the victim] died and the nature of her wounds" "[then-] State's Attorney Michael Nerheim agreed to clear Strong." (Briscoe, T. & Hinkel, D., "Man Convicted, then Cleared of Murder in Lake County Sues Police," *Chicago Tribune*, May 3, 2016.) As for the false confession in Mr. Strong's case, Sgt. Tessmann had: (i) testified that Strong cried tears indicative of remorse; (ii) ignored Strong's repeated pleas of innocence; (iii) ignored Strong's repeated requests for an attorney; (iv) coerced Strong's former girlfriend to lie about key evidence; and (v)

testified falsely at trial regarding the circumstances of the confession. *Strong v. Tessmann, et al.*, No. 16-CV-04885 (N.D. Ill.).

b. ***People v. Juan Rivera.*** Juan Rivera was charged and convicted of the murder of 11-year-old Holly Staker. However, DNA testing later proved that Mr. Rivera was innocent and he was exonerated after serving 19 years in prison. The (first) trial in Mr. Rivera's case took place just three months before Herman's trial here. Upon vacating his conviction, an Illinois appellate court specifically found that Mr. Rivera's confession was false and coerced and ruled that "the State's independent evidence does not inspire belief in defendant's candid acknowledgement of guilt." *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 43, 962 N.E.2d 53, 66. That acknowledgement of guilt was a confession which was initiated by Defendant Sgt. Fagan and obtained by Defendant Sgt. Tessmann. Jurors were misled when they were told that Rivera only knew details the killer could know. However, as the Illinois appellate court ruled, Sgt. Fagan and Sgt. Tessmann elicited testimony that was the product of "psychological suggestion and linguistic manipulation." There are striking similarities between Rivera's "confession" and Herman's here, including that Tessmann claimed that: (i) Rivera responded to questions with head nods; (ii) Rivera showed remorse for the murder; (iii) Rivera was given a 20-minute break during questioning; (iv) the interrogation was not recorded and notes were not taken; and (v) Rivera was "very comfortable, very relaxed" (though, to the contrary, Tessmann first encountered Rivera in a rubber room and just an hour earlier Rivera had been banging his head against glass and Rivera was handcuffed).

c. ***People v. Colleen Blue.*** Colleen Blue falsely confessed to giving birth to a baby and then putting the baby in a bag to die. She was charged with murder based on

her confession. Sgt. Tessmann told the *Chicago Daily Herald*, "She told us she had six kids already and just did not want to deal with another one." He added: "She said she gave birth to the baby when she was all alone, put him in the bag and walked off. She told us she could hear the baby crying until she got close enough to the street that passing cars drowned out the sound." However, DNA testing ultimately determined that the deceased baby was not Ms. Blue's and she had not even been pregnant or given birth to a baby.

d. ***Lombard Armed Robbery.*** In another case in 1990, involving armed robbery of a woman at knifepoint in Lombard, Illinois, in which a 19-year-old man was charged, Sgt. Tessmann told a grand jury that the victim had identified the 19-year-old man in a photo lineup. However, those charges were quickly dropped when another man admitted to the crime. In a deposition for the civil case filed by the 19-year-old man, the victim said that she had told Sgt. Tessmann that the man "looks the closest, but it's not him."

144. On information and belief, Sgt. Tessmann perpetrated such abuses in additional cases.

## XI. ASA Michael Mermel was forced to resign from the Lake County State's Attorney's Office in 2011 due to behavior unbecoming of a law enforcement officer.

145. ASA Michael Mermel's history as a prosecutor included a series of brash, public statements which resulted in his forced resignation from the Lake County State's Attorney's Office in 2011.

146. Specifically, in the case of exoneree Juan Rivera described above and in which Sgt. Tessmann was also involved, ASA Mermel made knowingly false and outlandish statements intended to muddy the DNA exoneration of Mr. Rivera. For example, ASA Mermel told *The New York Times* that the presence of another man's (not Rivera's) DNA inside the 11-year-old victim was the result of

the 11-year-old being sexually active, having sex with someone else on the day of the murder, after which Rivera arrived and raped the victim (but did not ejaculate) and murdered her.

147.     In a separate statement attacking Mr. Rivera's exoneration and the value of DNA evidence generally, ASA Mermel stated: "We don't fold our tents and run….we don't quaver because somebody holds up three letters: DNA." Further, ASA Mermel repeated his assertion that Mr. Rivera was a murderer and the 11-year-old victim was sexually active by analogizing the DNA found inside the victim to genetic material one might find on a hotel room TV remote control:

> "The example I like to give people is next time you go to a motel room, bring a plastic bag, because the dirtiest thing in the room is the remote control. Everybody has sex and then rolls over and goes, 'I wonder what's on?' . . . . O.K., so you can find DNA in the form of sperm from 10 different people in that room from that remote control or even on a person who has touched it. And that woman gets murdered in that room tonight and you are going to have a lot of DNA. Is it all going to be forensically significant?"

148.     In another case involving the sexual assault and murder of two little girls, ASA Mermel publicly stated that the semen found in the child victims had probably been picked-up by the children in the woods where people often have sex and then they probably wiped themselves un-sanitarily in the bathroom and spread the semen on themselves. This is just further evidence of Mermel's lack of fitness to practice law.

149.     Shortly thereafter, in 2011, ASA Mermel was forced to resign from the State's Attorney's Office due to his behavior.

**XII.   Herman Williams suffered ceaselessly during his three-decades long imprisonment and continues to suffer today.**

150.     Herman was imprisoned for nearly 29 years for a murder he did not commit.

151.     Herman experienced horrific and permanent injury, including but not limited to the pain of incarceration and the danger, stress, and fear that came with it; loss of freedom and self-determination; loss of time, affection, and support of/with loved ones, including his children Charlie and Crystal, his mother, father, and siblings; missed birthdays, weddings, graduations, funerals, births,

and other major life milestones; emotional pain and suffering of the most severe and persistent nature; and extreme psychological torment. He continues to suffer much of the same now that he has been released and struggles to adapt.

152. One of the most pernicious results of Herman's wrongful conviction was that his children, Charlie and Crystal, believed that their father had murdered their mother for the entirety of their lives.

153. Herman has also been deprived of the ability to earn a living and has lost wages for nearly 30 years as a result.

154. Herman received a bad conduct discharge from the Navy and has lost out on the benefits of that career, including all of the skills, experiences, and rewards attendant to being a decorated veteran, as Herman was and would have continued to be.

155. The human cost of Defendants' misconduct is staggering.

## CLAIMS

### COUNT 1
### 42 U.S.C. § 1983: Deprivation of Liberty Without Due Process of Law
**(Against Defendants Lucian Tessmann, Charles Fagan, Estate of Gregory Garofalo, deceased, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, Michael Mermel, Estate of Nancy Jones, deceased)**

156. Plaintiff incorporates the foregoing paragraphs as if full set forth here.

157. Defendant-officers Lucian Tessmann, Charles Fagan, Greg Garofalo, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, ASA Michael Mermel, and forensic pathologist Dr. Nancy Jones, under color of law and within the scope of their employment with their respective law enforcement agencies as well as the Lake County Major Crime Task Force, deprived Plaintiff of his clearly established constitutional right to due process of law and to a fair trial.

36

158.    Defendants deprived Plaintiff of his right to due process of law in the ways described in detail above and briefly summarized here as follows:

a.   Defendant Lou Tessmann fabricated a confession implicating Herman Williams as the murderer and fabricated details surrounding his purported interrogation of Herman to the same end.

b.   Defendant Charles Fagan facilitated Sgt. Tessmann's fabrication of evidence by failing to intervene to stop it and failing to disclose it. As the Task Force's Assistant Commander and lead investigator in the Penny Williams murder, Defendant Fagan also failed to intervene and has supervisory liability for the acts of his fellow officers in which he participated and/or had or should have had knowledge of, including evidence fabrication, witness coercion, and concealment of evidence.

c.   Defendant Estate of Greg Garofalo, deceased, fabricated statements from Herman Williams which were used to support a motive for his murdering Penny.

d.   Defendant Dennis Pensala fabricated evidence pertaining to the location of where Penny Williams' purse was found after her disappearance and failed to intervene with respect to others who did the same. Defendant Pensala also failed to disclose the unedited version of the videotape of Leo Arispe, which would have cast doubt on the validity of such evidence and helped establish Herman's innocence.

e.   Defendant Charles Bell fabricated evidence pertaining to the location of where Penny Williams' purse was found after her disappearance and failed to intervene with respect to others who did the same. Defendant Bell also failed to disclose the unedited version of the videotape of Leo Arispe, which would have cast doubt on the validity of such evidence and helped establish Herman's innocence. Further,

37

Defendant Bell coerced Wayne Ecklund to alter his testimony to state that he did not see Penny return with Herman on Wednesday evening.

f.  Defendant Richard Davies fabricated evidence pertaining to the location of where Penny Williams' purse was found after her disappearance and failed to intervene with respect to others who did the same.

g.  Defendant Robert Randall coerced Wayne Ecklund to alter his testimony to state that he did not see Penny return with Herman on Wednesday evening.

h.  Defendant Leonard Brezinski intentionally and unfairly discredited six-year-old Charlie Williams and coerced him into falsely changing testimony regarding his mother's whereabouts.

i.  Defendant Daniel Colin intentionally and unfairly discredited six-year-old Charlie Williams and coerced him into falsely changing testimony regarding his mother's whereabouts.

j.  Defendant Michael Mermel fabricated evidence pertaining to the location of where Penny Williams' purse was found after her disappearance and failed to intervene with respect to others who did the same. Defendant Mermel also failed to disclose the unedited version of the videotape of Leo Arispe, which would have cast doubt on the validity of such evidence and helped establish Herman's innocence. Furthermore, ASA Mermel fabricated evidence together with Dr. Nancy Jones as to the time of Penny Williams' death. ASA Mermel fabricated evidence of the purse location and time of death while performing an investigative function. Separately, ASA Mermel withheld and concealed additional exculpatory evidence from Herman, Herman's counsel, the court, and the jury, including his December 3, 1993, time-of-death memorandum as well as the recovery of Penny Williams'

blue-and-white striped shirt, and made arguments to the court and jury knowing they were contradicted by such evidence. Finally, in or around 2001, when Herman was seeking DNA testing to prove his innocence, ASA Mermel checked-out surveillance video of Herman from K-Mart and destroyed it (or continues to conceal it) — video which would have supported Herman's innocence.

 k. Defendant Estate of Nancy Jones, deceased, knowingly fabricated scientifically unsupportable time-of-death evidence and provided it to ASA Mermel and falsely testified at trial that she had not previously held a different opinion.

 l. To the extent the above officers, prosecutors, and medical examiners failed to intervene with respect to their fellow agents' unconstitutional conduct, they are liable for the injury caused to Plaintiff.

159. Had Defendants' fabrications of evidence and concealment and/or suppression of evidence been documented and/or disclosed, Plaintiff would have proved his innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony.

160. The fabricated evidence and the exculpatory and impeachment evidence withheld by Defendants undermined confidence in the verdict against Plaintiff, and the fabrication and concealment of this evidence deprived Plaintiff of a fair criminal trial.

161. Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable agent—including investigator, prosecutor, or medical examiner—in 1993 or 1994 would have believed such conduct was lawful.

162. For this count, Plaintiff seeks against Defendants actual damages, punitive damages, pre- and post-judgment interest, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 2**
**42 U.S.C. § 1983: Unlawful Detention**
**(Against Defendants Lucian Tessmann, Charles Fagan, Estate of Gregory Garofalo, deceased, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, Michael Mermel, Estate of Nancy Jones, deceased)**

163.    Plaintiff incorporates the foregoing allegations as if fully restated here.

164.    As more fully described above, Defendants, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate Plaintiff's unlawful detention without any probable cause, by using evidence which they knew to be false, and in spite of the fact that they knew Plaintiff was innocent, in violation of his constitutional rights.

165.    In so doing, Defendants caused Plaintiff to be unlawfully detained and deprived of his liberty without probable cause.

166.    Absent such misconduct, Plaintiff would not have been arrested, indicted, prosecuted, or convicted of the murder of Penny Williams. There was no credible evidence giving rise to probable cause to suspect Plaintiff of murder. Thus, as a direct and proximate result of the misconduct, Plaintiff was deprived of his constitutional rights to a fair trial and was detained and imprisoned without probable cause.

167.    Defendants' misconduct was objectively unreasonable, and Defendants acted intentionally and with willful indifference to Plaintiff's constitutional rights and innocence.

168.    The misconduct by Defendants directly and proximately caused Plaintiff injury and Plaintiff suffered damages as a result.

169.    The acts and omissions of Defendants were intentional, wanton, malicious, reckless, and oppressive.

170. For this count, Plaintiff seeks against Defendants actual damages, punitive damages, pre- and post-judgment interest, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 3
### 42 U.S.C. § 1983: *Monell* Liability: Failure to Supervise or Discipline for Investigative Misconduct
### (Against Defendants Lake County, Illinois; City of Waukegan, Illinois)

171. Plaintiff incorporates the foregoing allegations as if fully restated here.

172. Defendants, through the Lake County Major Crime Task Force, Lake County Sheriff's Office, and Waukegan Police Department, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of condoning investigative misconduct by failing to supervise or discipline its officers.

173. Such a pattern of investigative misconduct included coercing witnesses, fabricating evidence, and withholding/concealing material exculpatory evidence in violation of *Brady* and *Napue* obligations; failing to follow fundamental standards of investigative conduct like documenting evidence in or near real-time; and/or engaging in the affirmative and/or passive concealment of this type of misconduct.

174. Despite repeated instances of such investigative misconduct, including by at a minimum Sgt. Lou Tessmann and Sgt. Charles Fagan prior to the incident here, Defendants were deliberately indifferent to the need to supervise and/or discipline its officers. In those instances when they did supervise or discipline its officers, they either turned a blind eye to their misconduct or imposed discipline that was woefully deficient and did not include training, re-training, and/or counseling before permitting such officers to resume their duties.

175. The fabrication of evidence, intimidation and coercion of witnesses, documenting of false evidence, and withholding/concealing evidence against/from Plaintiff here was the result of Defendants' policy, pattern, practice, and/or custom at the relevant time.

176.     Defendants acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, Defendants have violated 42 U.S.C. § 1983.

177.     Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

178.     For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 4
**42 U.S.C. § 1983: *Monell* Liability: Investigative Misconduct, Including
Evidence Fabrication, Witness Coercion, and
Withholding/Concealing Material Exculpatory Evidence
(Against Defendants Lake County, Illinois; City of Waukegan, Illinois)**

179.     Plaintiff incorporates the foregoing allegations as if fully restated here.

180.     Defendants, through the Lake County Major Crimes Task Force, Lake County Sheriff's Office, and Waukegan Police Department, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of fabricating evidence, coercing witnesses, and withholding/concealing material exculpatory evidence against/from citizens like Plaintiff.

181.     Such a pattern was well known to Defendants due to numerous instances of such misconduct by officers prior to the time of Plaintiff's arrest. Nonetheless, Defendants knowingly permitted the pattern to persist and adopted it as an investigative tactic.

182.     Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

183.     Defendants acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, Defendants have violated 42 U.S.C. § 1983.

184.     For this count, Plaintiff seeks actual damages, pre- and post-judgment interest, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 5**
**42 U.S.C. § 1983: *Monell* Liability: Fabricating Evidence and**
**Non-Disclosure of Exculpatory Material Evidence**
**(Against Defendant Michael Waller, in his official capacity**
**as Lake County State's Attorney)**

185.    Plaintiff incorporates the foregoing allegations as if fully restated here.

186.    The Lake County State's Attorney's Office, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, pattern, practice, and/or custom of fabricating evidence against and/or withholding and suppressing material exculpatory evidence from citizens like Plaintiff.

187.    Such a pattern was well known to the Lake County State's Attorney's Office due to numerous instances of such misconduct by Assistant State's Attorneys, including Michael Mermel, prior to the time of Plaintiff's arrest and prosecution. Nonetheless, the Lake County State's Attorney's Office knowingly permitted the pattern to persist and adopted it as a prosecutorial tactic.

188.    In the alternative, with respect to *Brady/Napue* obligations in particular, despite Defendant's knowledge of its deficiencies in this respect and despite knowing that failing to train its ASAs on *Brady/Napue* obligations would result in the violation of the constitutional rights of citizens like Plaintiff, Defendant failed to train its ASAs.

189.    The Lake County State's Attorney's Office's failure to train in this respect constituted deliberate indifference to the known likelihood of constitutional violations resulting from such failure.

190.    Indeed, even if Defendant did not have a problematic history of *Brady/Napue* violations prior to Herman's prosecution, the danger of constitutional violations from the failure to train on such a common aspect of prosecutorial work as evidentiary disclosure obligations would have been extraordinarily obvious.

191.    The fabrication of evidence against and withholding of material exculpatory evidence from Plaintiff here was the result of Defendant's policy, pattern, practice, and/or custom.

192.     Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

193.     Defendant Michael Waller, in his official capacity, acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, Defendant has violated 42 U.S.C. § 1983.

194.     For this count, Plaintiff seeks actual damages, pre- and post-judgment interest, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 6**
**42 U.S.C. § 1983: Civil Rights Conspiracy**
**(Against All Defendants)**

195.     Plaintiff incorporates the foregoing allegations as if fully restated here.

196.     Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement to coerce, induce, and fabricate false evidence in the form of confessions, witness statements, and testimony for the purpose of framing Plaintiff for the murder of Penny Williams.

197.     Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled, and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights as described above.

198.     Defendants, acting in concert with known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

199.     In furtherance of that conspiracy, each of the co-conspirators committed overt acts and was a willful participant in joint activity.

200.     The misconduct described above was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

201.    As a direct and proximate result of this illicit agreement, Plaintiff was injured and suffered damages.

202.    For this count, Plaintiff seeks actual damages, punitive damages (against the individual defendants only), pre- and post-judgment interest, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 7
### Illinois Common Law: Malicious Prosecution
**(Against Defendants Lucian Tessmann, Charles Fagan, Estate of Gregory Garofalo, deceased, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, Michael Mermel, Estate of Nancy Jones, deceased)**

203.    Plaintiff incorporates the foregoing allegations as if fully restated here.

204.    Defendants caused the commencement or continuation of an original criminal proceeding against Plaintiff when there was no probable cause to do so.

205.    Plaintiff is innocent of the murder of Penny Williams. His conviction was vacated and he was released from prison on September 6, 2022, due to proof of his innocence.

206.    Defendants, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

207.    Plaintiff was injured as a direct and proximate result of the Defendants' unlawful actions and sustained damages.

208.    For this count, Plaintiff seeks actual damages, punitive damages, pre- and post-judgment interest, costs, and any other relief the Court deems just and equitable.

## COUNT 8
### Illinois Common Law: Intentional Infliction of Emotional Distress
**(Against Defendants Lucian Tessmann, Charles Fagan, Estate of Gregory Garofalo, deceased, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, Michael Mermel, Estate of Nancy Jones, deceased)**

209.    Plaintiff incorporates the foregoing allegations as if fully restated here.

210.    Defendants' conduct resulting in Plaintiff's wrongful arrest and decades of wrongful incarceration was extreme and outrageous.

211.    Defendants desired to inflict severe emotional distress on Plaintiff or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

212.    Plaintiff suffered severe emotional distress due to Defendants' conduct, which resulted in wrongful arrest and incarceration for decades for a murder he did not commit.

213.    For this count, Plaintiff seeks actual damages, punitive damages, costs, and any other relief the Court deems just and equitable.

## COUNT 9
### Illinois Common Law: Willful and Wanton Conduct
**(Against Defendants Lucian Tessmann, Charles Fagan, Estate of Gregory Garofalo, deceased, Dennis Pensala, Charles Bell, Richard Davies, Robert Randall, Leonard Brezinski, Daniel Colin, Michael Mermel, Estate of Nancy Jones, deceased)**

214.    Plaintiff incorporates the foregoing allegations as if fully restated here.

215.    At all relevant times, Defendants had a duty to refrain from willful and wanton conduct.

216.    Notwithstanding, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of Plaintiff's rights.

217.    As a result, Plaintiff was injured and sustained damages.

218.    For this count, Plaintiff seeks actual damages, punitive damages, pre- and post-judgment interest, costs, and any other relief the Court deems just and equitable.

## COUNT 10
### Illinois Common Law: Civil Conspiracy
### (Against All Defendants)

219.     Plaintiff incorporates the foregoing allegations as if fully restated here.

220.     As more fully described above, Defendants, acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

221.     In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willing participants in joint activity.

222.     The misconduct was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

223.     As a result of this conspiracy, as more fully described above, Plaintiff was injured and suffered damages.

224.     For this count, Plaintiff seeks actual damages, punitive damages (against the individual defendants only), pre- and post-judgment interest, costs, and any other relief the Court deems just and equitable.

## COUNT 11
### Illinois Common Law: *Respondeat Superior*
### (Against Defendants Lake County, Illinois; City of Waukegan, Illinois; Michael Waller, in his Official Capacity as Lake County State's Attorney; Village of Gurnee, Illinois; Village of Libertyville, Illinois; Village of Vernon Hills, Illinois; Cook County, Illinois)

225.     Plaintiff incorporates the foregoing allegations as if fully restated here.

226.     When they committed the acts alleged in this complaint, the individual Defendants were members and agents of the entities described above, acting at all relevant times within the scope of their employment and under color of law.

227.     Defendants are liable as principal for all torts committed by their respective agents.

228.   As a direct and proximate result of this misconduct, Plaintiff suffered injuries and sustained damages.

229.   For this count, Plaintiff seeks actual damages, pre- and post-judgment interest, costs, and any other relief the Court deems just and equitable.

**COUNT 12**
**Illinois Law: Indemnification**
**(Against Defendants Lake County, Illinois; City of Waukegan, Illinois; Michael Waller, in his Official Capacity as Lake County State's Attorney; Village of Gurnee, Illinois; Village of Libertyville, Illinois; Village of Vernon Hills, Illinois; Cook County, Illinois)**

230.   Plaintiff incorporates the foregoing allegations as if fully restated here.

231.   Illinois law provide that public entities must pay any tort judgment for compensatory damages for which its employees are liable based upon the employees' misconduct committed within the scope of their employment activities.

232.   The individual Defendants are or were employees of the entities described above, who acted within the scope of their employment in committing the misconduct described herein.

233.   Defendants are responsible to pay any judgment entered against the individual Defendants.

234.   For this count, Plaintiff seeks actual damages, pre- and post-judgment interest, costs, and any other relief the Court deems just and equitable.

**PRAYER FOR RELIEF**

Plaintiff requests the following relief from the Court:

a.   Compensatory damages against all Defendants in an amount to be determined by a jury;

b.   Punitive damages against all individual Defendants (not municipalities or official capacity defendants) in an amount to be determined by a jury;

c.   Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

d.   Attorney fees' as allowable by law and as ordered by the Court;

      e.      Reasonable costs; and

      f.      Such other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims herein.

Date:   August 23, 2023               HERMAN WILLIAMS

                              /s/     *Brian Eldridge*
                              One of the Attorneys for Plaintiff

Antonio M. Romanucci
Bryce T. Hensley
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
P. (312) 458-1000
aromanucci@rblaw.net
bhensley@rblaw.net

Steven Hart
Brian Eldridge
John Marrese
Carter Grant
**HART MCLAUGHLIN & ELDRIDGE, LLC**
One South Dearborn, Suite 1400
Chicago, Illinois 60603
P. (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com
cgrant@hmelegal.com

*Attorneys for Plaintiff Herman Williams*