# EXHIBIT 1

1                    STATE OF ILLINOIS

2        IN THE CIRCUIT COURT FOR THE 19TH JUDICIAL CIRCUIT

3                       LAKE COUNTY

4
    THE PEOPLE OF THE STATE      )
5   OF ILLINOIS,                 )
                                 )
6               Plaintiff,       )
                                 )
7        vs.                     ) NO. 93 CF 2081
                                 )
8   HERMAN WILLIAMS,             )
                                 )
9               Defendant.       )

10

11           REPORT OF PROCEEDINGS of the hearing before

12     the HONORABLE MARK L. LEVITT on September 6, 2022.

13

14        APPEARANCES:

15        ERIC RINEHART,
          Lake County State's Attorney,
16        for the People.

17        KEVIN MALIA,
          Lake County Assistant State's Attorney,
18        for the People.

19        LAUREN KAESEBERG,
          Attorney at Law,
20        with the Defendant.

21        VANESSA POTKIN,
          Attorney at Law,
22        with the Defendant.

23
                    MAGGIE R. GILBERT
24                 Official Court Reporter
                 IL License No. 084-004850

```
 1                        (Whereupon, the following

 2                        proceedings were held in open

 3                        court, commencing at 9:49 AM.)

 4

 5         THE COURT:  This is 93 CF 2081, People vs.

 6    Williams.  Mr. Williams is present.  He's in the

 7    custody of the Illinois Department of Corrections.

 8                 Parties, please identify yourselves for the

 9    record.

10         MR. MALIA:  Judge, before we do, is the Zoom

11    working?  We have --

12         THE COURT:  Zoom is on.

13         MR. MALIA:  Okay.  It's just the victim's family

14    was going to Zoom in.  They're out of state.

15         MS. KAESEBERG:  The live Zoom --

16         MR. MALIA:  We just wanted to confirm that.

17         THE COURT:  Just so you know, if you need to

18    contact anybody, I have -- it does not look like

19    anybody outside of court personnel is present.  So if

20    you need to contact somebody --

21         MS. KAESEBERG:  Do you know, your Honor, if the

22    live stream is working, because --

23         THE COURT:  I have no live stream.

24         MS. KAESEBERG:  Oh, there is no live stream.
```

1    THE COURT:  I admit everybody to Zoom.  So if we

2  take -- you want to take a few minutes?

3    MR. MALIA:  Could we?

4    THE COURT:  Absolutely.  Short recess.

5              (Recess taken.)

6    THE COURT:  This is recalling People vs.

7  Williams.

8          Parties, please identify yourselves for the

9  record.

10    MR. MALIA:  Judge, for the State, Kevin Malia

11  and Eric Rinehart.  We are present in person.

12    MS. KAESEBERG:  Good morning, your Honor.

13  Lauren Kaeseberg with the Illinois Innocence Project

14  with Mr. Herman Williams, who is present in court.

15    MS. POTKIN:  And Vanessa Potkin with the

16  Innocence Project also for Mr. Williams.

17    THE COURT:  Thank you very much.  All right.

18          Parties sent in several stipulations for

19  purposes of today's proceeding.  I have received

20  seven stipulations.  Is that accurate?

21    MR. MALIA:  That's -- yes, Judge.

22    THE COURT:  So how do the parties wish to

23  proceed today, Mr. Malia?

24    MR. MALIA:  Well, Judge, I think the Court

1   already put it on the record.  But just to make

2   clear, this is up today on a hearing.  The defendant

3   has filed a petition for relief of judgment and to

4   vacate conviction pursuant to 735 ILCS 5/2-1401.

5   This is a petition that ultimately the State is not

6   opposing under the circumstances.  As your Honor

7   said, it is technically up for a hearing today.  We

8   are asking to move forward with the hearing by way of

9   stipulations.  We have seven stipulations to enter

10  into the record this morning.

11      THE COURT:  Defense?

12      MS. KAESEBERG:  We would agree with that, your

13  Honor, and we'd ask that the parties be permitted to

14  read the stipulations into the record.  I know

15  there's some exhibits that we would enter as well.

16      THE COURT:  You may.

17          As a procedural matter, State agrees that

18  the 2-1401 is timely filed?

19      MR. MALIA:  Yes.

20      THE COURT:  And by way of your representation to

21  me, you believe that you have no good-faith basis to

22  oppose it?

23      MR. MALIA:  Correct.

24      THE COURT:  And you fulfilled your duties

1   pursuant to statute in notifying the victims of these

2   proceedings and of all of the underlying facts?

3        MR. MALIA:  Yes.

4        THE COURT:  As you know them to be?

5        MR. MALIA:  Yes.  And, Judge, I would put on the

6   record I know the victim in this case is a woman by

7   the name of Penny Williams.  Her sister and, I

8   believe, her mother as well as both of her kids are

9   present via Zoom.  I certainly see her sister's

10   log-in on the Zoom.  I believe she is physically with

11   Ms. Williams' mother.

12        For the record, I have also sent them a

13   copy of the petition that the defendant filed.  I

14   know they've had a chance to review that.  Since it's

15   been filed, we have stayed in pretty regular contact

16   with Ms. Daly and Ms. Williams' family.

17        THE COURT:  Thank you very much.

18        MS. KAESEBERG:  And, your Honor, if I may as

19   well?  Mr. Williams and the victim in this case,

20   Penny Williams, had two children together, and both

21   of those children, Charlie and Crystal, are in

22   receipt of the Zoom information.  We were texting

23   earlier, and I believe they're also on the Zoom

24   observing the hearing as well.

1      THE COURT:  Very good.

2          Defense, you can proceed.

3      MR. MALIA:  Judge, I'll read the first.  The

4 first stipulation, Number 1, it is hereby stipulated

5 by and between the parties:

6          After a jury trial in 1994, Herman Williams

7 was convicted of the September 1993 murder of Penny

8 Williams.  The conviction was based upon evidence

9 which included serological blood testing,

10 time-of-death pathology, an alleged confession, and

11 testimony regarding the location of where

12 Ms. Williams' purse was found.  The parties agree

13 that newly discovered material and noncumulative

14 evidence now exists which, if presented to a jury,

15 would be likely to change the result upon trial.  The

16 parties also agree that Mr. Williams' constitutional

17 rights were violated when exculpatory evidence was

18 suppressed and by the State's use of false and

19 misleading evidence at trial.  And as a result,

20 pursuant to 735 ILCS 5/2-1401, Mr. Williams'

21 conviction should be vacated.

22          The State does not oppose the relief

23 requested in the defendant's petition for relief of

24 judgment and to vacate conviction pursuant to

1    735 ILCS 5/2-1401.  Furthermore, the parties agree

2    that Mr. Williams' petition meets the legal standard

3    for relief as detailed in the petition.

4         It is hereby agreed by the parties.  This

5    is a stipulation signed by myself as well as

6    Ms. Kaeseberg and Ms. Potkin.

7         And we'd ask to enter that.  Judge, I don't

8    know if it just makes more sense logistically to

9    enter them in the record after we've read them all

10   or --

11        THE COURT:  That's fine.

12        MR. MALIA:  Okay.

13        MS. POTKIN:  With regard to Stipulation

14   Number 2, pertaining to the DNA evidence, it is

15   hereby stipulated by and between the parties:

16        At trial, evidence was presented that Penny

17   Williams died as the result of a close-range, violent

18   confrontation.  Ms. Williams was beaten numerous

19   times with an object and had severe injuries on her

20   head and body.  She had defensive wounds on her arms

21   indicative that she fought to defend herself from her

22   attacker.  In an effort to recover biological

23   evidence to identify her assailant, fingernail

24   clippings were collected from each of Ms. Williams'

1  fingernails at autopsy. Given the limitations of the

2  DNA technology in use at the time of Ms. Williams'

3  trial -- Mr. Williams' trial, which required a larger

4  amount of biological evidence than is required today

5  to obtain a genetic profile, testing at the Northern

6  Illinois Police Crime Laboratory was inconclusive, a

7  fact stipulated to at trial.

8        At trial, in an effort to connect him to

9  the crime, the State presented testimony from several

10  forensic analysts regarding the collection and

11  testing of a small amount of blood recovered from

12  Mr. Williams' truck. While the Illinois State Police

13  was unable to do DNA typing on the blood evidence,

14  the laboratory was able to identify a blood type

15  through conventional serology. The jury was told

16  that based on ABO blood typing, the blood evidence

17  from Mr. Williams' vehicle revealed a blood type that

18  was the same as Penny Williams.

19        Since the time of trial, DNA technology has

20  become far more sensitive and discriminating than the

21  DQ Alpha DNA test and conventional serology that were

22  available at trial. The STR and Y-STR DNA test,

23  which targets male DNA, enabled the biological

24  evidence in this case to be successfully genetically

1    typed.

2          This Court granted Mr. Williams' unopposed

3    725 ILCS 116-3 motion for DNA testing.  Based on

4    orders entered on March 2nd, 2016, and February 7th,

5    2019, testing in this case proceeded at Bode

6    Laboratory and Forensic Analytical Crime Laboratory,

7    FACL.  FACL's final report was issued on March 8th,

8    2021.

9          If called to testify, Nancy Dinh, formerly

10   Nancy Wilson, would testify that she is a forensic

11   scientist with FACL who conducted DNA testing on the

12   blood evidence and fingernail evidence from this

13   case.  The parties stipulate to Ms. Dinh's admission

14   as an expert in DNA testing and analysis.

15         Ms. Dinh would testify that she performed

16   Y-STR testing on the biological material collected

17   from Ms. Williams' fingernails at autopsy.  That

18   testing revealed male DNA from under Ms. Williams'

19   fingernails.  Ms. Dinh performed a comparison of

20   Herman Williams' DNA to the crime scene evidence.

21   The DNA test results conclusively eliminated Herman

22   Williams as a source of the male DNA obtained from

23   under Ms. Williams' fingernails.

24         The presence of male DNA under Penny

1   Williams' fingernails is probative scientific

2   evidence that someone other than Mr. Williams beat

3   and killed Penny Williams.

4          Further, Ms. Dinh would testify that she

5   conducted STR DNA testing of blood samples found in

6   Mr. Williams' truck which had been attributed to

7   Penny Williams at trial and used to link Mr. Williams

8   to the crime scene.  DNA testing established that the

9   trace blood evidence from Mr. Williams' truck does

10  not belong to Penny Williams.

11         At trial, the State's theory was that

12  Ms. Williams discarded -- Mr. Williams discarded

13  Penny Williams' purse in a dumpster after committing

14  the crime.

15         Ms. Dinh would also testify that she

16  reviewed the Y-STR DNA results conducted by Bode

17  Laboratory on Penny Williams' purse and items within

18  the purse for touch or handler DNA.  Such testing was

19  unavailable at the time of Mr. Williams' trial.

20  Ms. Dinh would testify that Bode identified a major

21  component of a partial Y-DNA profile from a swab of

22  the exterior of the checkbook from inside the purse.

23  That major component was suitable for comparison.

24  And when compared to Herman Williams' DNA profile,

1    Herman Williams is excluded as the source of that

2    male DNA.

3           The parties agree to enter into evidence

4    the report of FACL as Exhibit 1, the CV of Nancy Dinh

5    as Exhibit 2, and the report of Bode as Exhibit 3.

6           It is hereby agreed by the parties and

7    signed to by both the State and counsel for

8    Mr. Williams.

9           Stipulation 3, regarding time-of-death

10   pathology, it is hereby stipulated by and between the

11   parties:

12          At trial, Penny Williams' time of death was

13   a crucial component of the State's case.

14   Ms. Williams' body was found on the afternoon of

15   Sunday, September 26th, 1993.  The State's theory

16   centered on Ms. Williams being killed the night of

17   Wednesday, September 22nd.  The defense maintained

18   that Ms. Williams returned home Wednesday night, was

19   seen alive Thursday morning, and she was killed

20   sometime after that.  Herman Williams' whereabouts

21   were essentially accounted for from the morning of

22   Thursday, September 23rd, until Ms. Williams' body

23   was recovered on Sunday, September 26th.

24          The State presented testimony from forensic

1    pathologist Dr. Nancy Jones who conducted the autopsy

2    on Ms. Williams on the evening of September 26th,

3    1993, the date her body was found.  Dr. Jones

4    testified to a time of death in a very small window

5    of time that aligned with the State's theory.

6    Dr. Jones testified that to a reasonable degree of

7    medical certainty, Penny Williams' most probable time

8    of death was before midnight on Wednesday,

9    September 22nd, or 1:00 AM on Thursday,

10   September 23rd.

11          The parties would stipulate that Dr. Jones'

12   opinion that Ms. Williams' death occurred before

13   midnight on Wednesday, September 22nd, and no later

14   than 1:00 AM on Thursday, September 23rd, i.e., death

15   occurred 86 hours or greater from the discovery of

16   her body, is not scientifically supported.

17          The parties would stipulate to Dr. James

18   Filkins' admission as an expert in forensic pathology

19   before this Court.  Dr. Filkins would testify that he

20   reviewed the autopsy evidence in this case and the

21   trial testimony of Dr. Jones.  Dr. Filkins would

22   testify that there is no scientific basis to support

23   the narrow time-of-death window as testified to by

24   Dr. Jones.

1          Dr. Filkins would testify that based on

2     established principles of forensic pathology,

3     Ms. Williams' time of death likely occurred 24 to

4     36 hours prior to the recovery of her body.  That

5     would put time of death most likely sometime on

6     Saturday, September 25th, 1993, a time at which

7     Mr. Williams' whereabouts were accounted for.

8          The parties agree that in 2022, the State

9     consulted expert Dr. Eimad Zakariya, a forensic

10    pathologist with the Lake County Coroner's Office.

11    Dr. Zakariya also reviewed the autopsy evidence in

12    this case and trial testimony of Dr. Jones and found

13    that the time-of-death testimony presented by the

14    State at Mr. Williams' trial is scientifically

15    unsupportable.  He concluded that the more likely

16    timeframe of Ms. Williams' death is closer to when

17    her body was found on Sunday, September 26th, 1993.

18    Dr. Zakariya would testify that he could find, quote,

19    no scenario which would support Dr. Jones' opinion

20    regarding Ms. Williams' time of death.

21         The parties agree to enter into evidence

22    the report of Dr. Filkins, Exhibit 4, and the CV of

23    Dr. Filkins as Exhibit 5.

24         Related to time of death is Stipulation

1   Number 4, Brady violation.  It is hereby stipulated

2   by and between the parties:

3          The parties agree and stipulate that the

4   State presented -- sorry -- the State suppressed

5   exculpatory evidence which was material to the

6   previously described crucial issue of Penny Williams'

7   time of death.

8          At Mr. Williams' trial, the State's

9   forensic pathologist, Dr. Nancy Jones, testified that

10  Penny Williams' time of death was prior to 1:00 AM on

11  Thursday, September 23rd.  The State argued to the

12  jury that Dr. Jones, quote, didn't waver from her

13  estimate of time, unquote.  Dr. Jones testified on

14  cross-examination that her time-of-death estimate was

15  limited to, quote, Wednesday or going into early

16  Thursday morning, but I did explain that by early, I

17  mean in the wee hours of the morning, midnight to

18  one, that range, end quote.

19         However, the State possessed but failed to

20  disclose Dr. Jones' initial time-of-death

21  determination that was inclusive of Friday morning,

22  September 24th.  Dr. Jones' expert opinion was

23  conveyed to lead trial counsel, Assistant State's

24  Attorney Michael Mermel, and was documented in a

1    pretrial December 3rd, 1993, interoffice

2    correspondence between ASA Mermel and second chair,

3    ASA Robin Goodstein.

4         A 2021 review of work product in the

5    State's attorney's file revealed the December 3rd,

6    1993, interoffice memo.  This memo was not disclosed

7    to the defense counsel prior to Mr. Williams' trial.

8         Dr. Jones' suppressed expert opinion that

9    Ms. Williams' likely time of death included Thursday

10   and the early morning hours of Friday was material to

11   the defense as it included timeframes that eliminated

12   Mr. Williams as a suspect and was consistent with the

13   defense theory that Ms. Williams was alive and home

14   on Wednesday night and went missing and was killed

15   sometime after she left home on the morning of

16   Thursday, September 23rd.  Dr. Jones' expert opinion

17   extending time of death to Thursday into Friday

18   morning greatly reduced, if not eliminated,

19   Mr. Williams' opportunity to commit the crime.

20   Herman Williams' whereabouts were essentially

21   accounted for from the morning of Thursday,

22   September 23rd, until Ms. Williams' body was

23   recovered on Sunday, September 26th.

24        The parties agree to enter into evidence a

1    copy of the December 3rd, 1993, interoffice memo note

2    as Exhibit 7.

3        MS. KAESEBERG:   Stipulation 5, relating to the

4    confession, it is hereby stipulated by and between

5    the parties:

6            At Mr. Williams' trial, the State presented

7    testimony from then-Detective Lou Tessman, deputy

8    commander of the Lake County Major Crimes Task Force

9    and a lead investigator on this case.  Detective

10   Tessman testified that on September 30th, 1993,

11   during a custodial interrogation, Mr. Williams

12   confessed to him to murdering Penny Williams by

13   crying; nodding his head affirmatively to specific

14   questions about the murder; and stating, quote, I

15   know what I did was wrong, and I am sorry for what

16   happened, end quote.  At trial, Tessman testified he

17   remembered the specific words of his questions and

18   Mr. Williams' answers despite having not taken any

19   contemporaneous notes and having no audio or video

20   recording of the interrogation.  Detective Tessman's

21   report detailing the alleged confession was not typed

22   up until almost two weeks after the purported

23   interview.

24           Herman Williams testified at trial that he

1    never confessed to Detective Tessman, neither through

2    words nor head nods.  To the contrary, Mr. Williams

3    testified that he invoked his right to counsel and

4    would not speak to Detective Tessman.

5           The parties would stipulate that at a

6    pretrial proceeding, the coroner's inquest, the

7    commander of the Lake County Major Crimes Task Force,

8    Chuck Fagan, testified under oath that, quote, the

9    members of the Lake County Major Crimes Task Force

10   never had an opportunity to interview Mr. Williams;

11   originally, when he reported this disappearance to

12   the Gurnee Police Department, for some period of

13   time, in parentheticals, on Friday, September 24th,

14   they questioned him, and he denied any involvement in

15   her disappearance, and subsequent to their interview,

16   he retained an attorney, and we had no further

17   conversation with Mr. Williams in regards to the

18   disappearance of his ex-wife, end quote.

19          The parties would further stipulate that

20   then-State's Attorney Michael Waller publicly stated

21   that Mr. Williams did not speak to the police or give

22   a statement after his arrest.  In a Chicago Tribune

23   article from October 1st, 1993, the day after

24   Tessman's purported interrogation, State's Attorney

1    Waller stated that, quote, the suspect made no

2    statement to authorities about his former wife's

3    death after his arrest, end quote.

4         The parties agree and would stipulate that

5    since the time of Mr. Williams' trial, it has come to

6    light that Detective Tessman has engaged in a pattern

7    of misconduct by giving false testimony under oath

8    related to the circumstances of custodial

9    interrogations and manufacturing confession evidence

10   in other cases.

11        These cases include the case of Jason

12   Strong, who was similarly convicted and later

13   exonerated based on erroneous time-of-death testimony

14   and a purported confession by Detective Tessman.

15        In addition, in the case of Juan Rivera,

16   who was ultimately exonerated, Detective Tessman

17   testified in a similar fashion to what we now know

18   was a false confession.

19        At the time of trial, when the jury weighed

20   the credibility of Mr. Williams' denials against

21   Detective Tessman's testimony that Mr. Williams had

22   confessed, it did so unaware of the pattern and

23   practice of misconduct in which Tessman has engaged.

24   This history includes involvement in securing false

1  confessions and false testimony about the

2  circumstances of custodial interrogations that he

3  conducted and purported admissions he claimed were

4  made by suspects who turned out to be innocent.

5      The parties agree there exists substantial,

6  newly discovered evidence of police misconduct that

7  resulted in Mr. Williams' unconstitutional

8  conviction.

9      It is hereby agreed by the parties and

10  signed by both parties.

11      Stipulation Number 6, regarding Penny

12  Williams' shirt, it is hereby stipulated by and

13  between the parties:

14      The time of Penny Williams' disappearance

15  and death was a significant issue at trial.  The

16  State maintained that Penny Williams was killed

17  between approximately 8:00 PM and 9:00 PM on

18  September 22nd, 1993, after she left out of her

19  apartment complex with Mr. Williams.  The defense

20  maintained that Ms. Williams returned home Wednesday

21  night, September 22nd, and went missing Thursday,

22  September 23rd.

23      At the time of Mr. Williams' trial,

24  witnesses told police that when Penny Williams left

her apartment complex on the night of Wednesday, September 22nd, she was wearing a blue and white-striped, button-down, men's-style shirt. The evidence at trial showed that when her body was recovered, Ms. Williams was wearing a different floral-style dress shirt.

At trial, the defense argued to the jury that the fact that Ms. Williams was found in a floral shirt as opposed to the striped shirt undermined the State's theory that she was killed on Wednesday night, September 22nd, within an hour of leaving her apartment complex and supported the fact that she had returned home on Wednesday night, September 22nd, and that she did not actually go missing until Thursday, September 23rd.

The State argued to the jury that Ms. Williams may have been wearing two button-down shirts on Wednesday night when she was killed and that the assailant may have disposed of the striped shirt which had never been located and was unaccounted for. This was an effort to account for the witness accounts of her wearing a striped shirt when she was seen leaving the apartment the night of Wednesday, September 22nd, although she was found in

1  a different floral shirt.

2          In fact, the police retrieved a blue and

3  white-striped, button-down shirt during a

4  September 24th search of Penny Williams' apartment.

5  The shirt was in police evidence at the time of the

6  trial where it remains to this day.

7          The State presented false evidence and

8  misleading arguments to the jury on this issue.

9          It is hereby agreed by the parties and

10  signed by both parties.

11          Stipulation 7, Penny Williams' purse, it is

12  hereby stipulated by and between the parties:

13          During the investigation of this case, a

14  purse belonging to Penny Williams was turned into

15  authorities by an individual later identified as

16  Jimmy Correa.  Mr. Correa, C-O-R-R-E-A, indicated

17  that it had been found in a trash can at a car wash

18  in Park City, Illinois.  Further investigation would

19  reveal that it had been found by Mr. Correa's

20  brother-in-law, Leo Arispe, A-R-I-S-P-E.  As the

21  State alluded to during the trial and as was made

22  clear by his testimony, Mr. Arispe suffers from an

23  intellectual or cognitive disability.  Through the

24  course of the investigation, the location changed as

1    to where the purse was alleged to have been found.

2    By the time of trial, the State represented that the

3    purse was found in a dumpster outside of the nearby

4    apartment building where Katherine Williams,

5    Mr. Williams' then-current wife from whom he was

6    separated, lived.

7            At trial, evidence regarding the purse was

8    introduced by the State through testimony,

9    stipulations, and a video.  Leo Arispe's testimony

10   included the following:  He stated that he did not

11   remember where he lived; when asked what time he

12   found the purse, he said, quote, four, twelve, end

13   quote, as he held up two fingers; he did not remember

14   what day he found it; he found it in a garbage can;

15   and that ASA Mermel told him, Arispe, where and in

16   what dumpster he, Arispe, had found the purse.  The

17   Court stopped Mr. Arispe's testimony during

18   cross-examination and told defense counsel he could

19   recall Mr. Arispe to complete cross at such time as

20   he obtained a Spanish-speaking interpreter.  However,

21   defense counsel failed to recall Mr. Arispe to

22   complete his cross-examination.  And then for reasons

23   not put on the record, defense counsel agreed to

24   stipulate to the purse being found at a time and

1    place that was disputed and which supported the

2    State's theory.

3           The State also presented testimony from

4    Jimmy Correa who testified on direct to questions

5    from ASA Mermel that he, Correa, did not make any

6    statements to law enforcement as to where he thought

7    the purse had been found.  That testimony contradicts

8    the police reports which demonstrate that Correa told

9    law enforcement that the purse had been found in a

10   garbage can at the car wash.  Defense counsel did not

11   cross-examine Correa.

12          The State played for the jury an edited

13   video of Mr. Arispe pointing at a dumpster outside of

14   the apartment building of Katherine Williams.  This

15   video was filmed on February 7th, 1994, one week

16   before the start of trial, and obtained at the

17   request of ASA Mermel who accompanied an investigator

18   from the State's Attorney's Office, Dennis Pensala,

19   P-E-N-S-A-L-A, who recorded it.  The video starts out

20   with Mr. Arispe already standing in front of an open

21   dumpster pointing his finger down to the dumpster

22   opening.  It then cuts to edited scenes of the area

23   surrounding the building and parking lots.  The video

24   has no sound.  Investigator Pensala testified on

1   direct questioning from ASA Mermel that neither he,

2   Pensala, nor ASA Mermel knew the location of the

3   dumpster when they went to film the video, giving the

4   impression that Mr. Arispe directed them there.

5   However, this is contradicted by police reports which

6   both Pensala and Mermel had access to at the time

7   which did contain the location.  Defense counsel did

8   not cross-examine Pensala.

9           The defense called as a witness David

10  Wright, W-R-I-G-H-T, who was a garbage truck driver

11  who gave a window of time of garbage pickup that left

12  some room for debate about whether the purse was

13  possibly placed in the dumpster sometime after

14  garbage pickup on Thursday which would have supported

15  the defense theory.  However, defense counsel later

16  stipulated to testimony from Olga Wengel,

17  W-E-N-G-E-L, the sister of Mr. Arispe, which agreed

18  to a disputed fact about when she was tendered the

19  purse.  The stipulation put it at about noon on

20  Thursday which supported the State's theory.

21          The stipulations and testimony were a main

22  part of the State's closing arguments to the jury.

23          With regard to this evidence, Mr. Williams'

24  rights to due process, effective assistance of

1    counsel, and confrontation were violated.

2           It is hereby agreed by the parties and

3    signed by the parties.

4           And, your Honor, that completes the

5    stipulations.  We would rest on our petition, which

6    is rather lengthy.

7           If I may just read into the record very

8    briefly some very short just statements of law to put

9    them into the record?  So a new trial must be granted

10   if petitioner proves by a preponderance of the

11   evidence that he has new, material, noncumulative

12   evidence of such a conclusive nature that it would

13   probably change the result on retrial.  And that is

14   from People vs. Waters, citing to People vs.

15   Washington.

16          The trial court must consider -- this is a

17   quote -- whether the new evidence placed the evidence

18   presented at trial in a different light and undercuts

19   the Court's confidence in the factual correctness of

20   the guilty verdict, end quote.

21          Quote, the trial court should not re-decide

22   the defendant's guilt in deciding whether to grant

23   relief, end quote.  And that is from People vs.

24   Molstad, M-O-L-S-T-A-D.

1     We would also -- we rely on Brady in this

2     petition as well.  And to establish a Brady

3     violation, a defendant must show that, one, the

4     prosecution suppressed evidence, whether willfully or

5     inadvertently; two, the evidence was favorable to the

6     accused because it is exculpatory or impeaching; and,

7     three, the suppressed evidence was material to an

8     issue at trial.  And that cites to People vs. Beaman,

9     State vs. McNeil, and Strickler on the Brady issue.

10     In addition, there is false testimony in

11     this case.  And, quote, a conviction obtained by the

12     knowing use of perjured testimony must be set aside

13     if there is any reasonable likelihood that the

14     false testimony could have affected the jury's

15     verdict, citing to People vs. Olinger, citing United

16     States vs. Bagley.

17     And ineffectiveness in this case, in the

18     petition we go through the legal standard for that

19     which is, you know, based on Strickland vs.

20     Washington, where counsel's representation falls

21     below an objective standard of reasonableness and the

22     defendant suffers prejudice as a result.  That's a

23     constitutional violation worthy of a new trial.

24     And finally, the petition ends with an

1    argument that the cumulative errors in this case

2    should result in a new trial. And the Illinois

3    Supreme Court has clearly held that these cumulative

4    errors can deprive a defendant of due process and

5    should be remedied by vacating the conviction and

6    sentence. And that is a cite to People vs. Blue.

7          And other than that, we would rest on our

8    rather lengthy petition before the Court. We

9    prepared an agreed order, and we would implore your

10    Honor to consider ruling today and signing that

11    agreed order today.

12       THE COURT: State?

13       MR. MALIA: Judge, we don't have any additional

14    argument. As stated previously, we do feel that the

15    defendant has met the standard required in his

16    petition for relief based on 735 ILCS 5/2-1401 based

17    on the stipulations entered into the record.

18          Your Honor, we concede that, obviously, as

19    we had stated, that there has been a Brady violation

20    and all the number of issues that the defense has

21    raised both in their petition and obviously through

22    their stipulations and argument today. So we would

23    ask that the Court grant the relief requested by the

24    defendant today.

1      THE COURT:  Thank you.

2           I have read and reviewed the petition for

3      relief from judgment.  I have carefully considered

4      the factual underpinnings for that document.  I've

5      certainly paid attention carefully to what you've

6      read here today.  And thank you for providing that to

7      me in advance which allowed me the opportunity to go

8      through it before these proceedings.

9           And after having read and reviewed all this

10     material, considering the fact that the State is not

11     opposed to it and is, in fact, stipulating to the

12     factual basis for all of the relief that was sought,

13     I find that there is a sufficient factual basis and a

14     sufficient legal basis at law to grant the relief

15     sought.  And I will do so today.

16          Parties can provide me a copy of the order.

17     I'm happy to sign that after I review it.

18     MR. MALIA:  Judge, the only other thing that we

19     would put on the record, obviously the defendant

20     today is -- the relief being sought is a vacation of

21     the conviction --

22     THE COURT:  Yes.

23     MR. MALIA:  -- which the Court is granting.  We

24     would put on the record that, based on the issues

1    that have come up through the further investigation

2    of this case, the stipulations entered into the

3    record, specifically all of the new evidence, the DNA

4    evidence, I would say specifically also the new

5    forensic pathology evidence, and obviously the length

6    of time that has elapsed since the date of offense,

7    that the State does not feel we can move forward on a

8    new trial or prove this case beyond a reasonable

9    doubt.  So we are seeking leave to nolle pros the

10   case today as well.

11        THE COURT:  That will be allowed.  That's within

12   your discretion.

13             All right.  Thank you.

14        MR. MALIA:  Thank you, your Honor.

15        THE COURT:  End of record.

16                  (End of proceedings.)

17

18

19

20

21

22

23

24

1                    STATE OF ILLINOIS

2    IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT

3                     LAKE COUNTY

4

5        I, MAGGIE R. GILBERT, CSR (084-004850), an

6    Official Court Reporter for the Circuit Court of

7    Lake County, 19th Judicial Circuit of Illinois,

8    reported in machine shorthand the proceedings had

9    in the hearing in the above-entitled cause and

10   transcribed the same by Computer-Aided Transcription,

11   which I hereby certify to be a true and accurate

12   transcript of the proceedings had before the

13   Honorable Mark L. Levitt.

14

15                         _Maggie R. Gilbert_

16                    Official Court Reporter

17

     Dated:  This 31st day of July, 2023

18

19

20

21

22

23

24